ESTATE OF CLARENCE J. GROOTEMAAT, M & I MARSHALL & ILSLEY BANK, Executor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Grootemaat v. Commissioner
Docket No. 7757-75.
United States Tax Court
T.C. Memo 1979-49; 1979 Tax Ct. Memo LEXIS 478; 38 T.C.M. (CCH) 198; T.C.M. (RIA) 79049; February 7, 1979, Filed Arthur F. Lubke, Jr., and William R. Steinmetz, for the petitioner. Scott R. Cox, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency of $ 63,899.75 in petitioner's *479 Federal estate tax. Due to concessions by the parties, the only issue for decision is the valuation of certain stock of a real estate development company which the decedent owned at the time of his death. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Decedent, Clarence J. Grootemaat, died testate on November 7, 1971. At his death, decedent resided in Milwaukee County, Wisconsin. The M & I Marshall & Ilsley Bank, a corporation with its principal place of business in Milwaukee, Wisconsin on the date the petition was filed herein, is the duly appointed and acting personal representative of the estate. Petitioner filed its Federal estate tax return with the District Director of Internal Revenue at Milwaukee, Wisconsin on August 9, 1972. At the time of his death, the decedent owned 40 shares of stock of Greendale Land Company, Inc. (hereinafter GLC). Ten of these shares were class A voting common stock, and 30 were class B nonvoting common stock. Decedent's stock interest in GLC constituted 10 percent of the total outstanding shares of each of GLC's *480 two classes of stock. The 40 shares of GLC stock were included on the estate tax return at a combined value of $ 46,000, or $ 1,150 per share. In his notice of deficiency, respondent determined the aggregate value of the shares to be $ 222,960, or $ 5,574 per share. At trial, respondent amended his position and he now asserts that the per share value of GLC stock on November 7, 1971 was $ 4,466, or an aggregate value of $ 178,640 for decedent's interest in GLC at his death. GLC was incorporated in the State of Wisconsin in January of 1965. At all times, GLC has had 400 shares of stock outstanding--100 shares of class A voting common and 300 shares of class B nonvoting stock. Each share of stock has a stated par value of $ 1.25. The initial capital contribution for GLC was $ 500, and its original shareholdings were as follows: Shareholder [1]
Class A
Class B
E. H. Grootemaat
50
153
James E. Grootemaat
11
30
C. J. Grootemaat e8deedent)
10
30
Gordon Gile
10
30
Robert Eschweiler
10
30
John F. Dill
9
27
Total
100
300
*481 There was only one change in the share ownership in GLC between its date of incorporation and November 7, 1971. This occurred when the estate of John F. Dill, who died March 16, 1971, succeeded to his stock interest. GLC was organized for the purpose of acquiring and developing land located in the Village of Greendale in Milwaukee County. The original development of the Village of Greendale was undertaken by the Federal Government in 1935. Approximately 3,410 acres of undeveloped land were acquired in an area 8.5 miles southwest of downtown Milwaukee to develop a model suburb known as a Greenbelt Town. In 1952, the Milawukee Community Development Corp. (MCDC) was formed to purchase the then remaining undeveloped land in Greendale, approximately 2,288 acres, and to continue the planned development of Greendale. In January 1965, GLC acquired the stock of MCDC. The purchase price for the stock of MCDC was based upon a value of approximately $ 1,300 per acre for the then remaining 1,000 acres of undeveloped land in Greendale. Immediately after the purchase, MCDC was liquidated and the land transferred to GLC. In the normal course of its business, GLC developed and sold *482 residential lots in Greendale. It also sold some larger parcels of land located in Greendale. The development activities of GLC were intended to facilitate the orderly development of the property located in the Village of Greendale. These activities included planning the development, making site improvements to the land required before subdivision was possible (such as sewers, water, roads and sidewalks), and handling much of the administrative contact with the state and local agencies authorized to oversee the use and development of land. Grootemaat Investment Company is the principal sales agency for the real estate owned by GLC. This is handled by James Stahlman, a licensed Wisconsin real estate broker and an officer of GLC. The second sales agency is A.L. Grootemaat & Sons, Inc., which has two licensed salespeople. Brokerage commissions are paid according to various agreements at rates approximating four to six percent of sales. As of the decedent's death, GLC owned approximately 302 of the 1000 acres it had acquired in 1965. This remaining property located in Greendale consisted of a number of parcels of land. The following table lists the parcels owned by GLC on *483 November 7, 1971, the fair market value of each parcel on that date as stipulated by the parties, and a description of the anticipated use of each parcel when developed. PARCEL
FAIR DESIGNATION
ACERAGE
USE DESCRIPTION
MARKET VALUE
1.1 & 1.1A
73.39
2 Multi-family parcels $ 640,000
3
100
220 Single family lots
550,000
Recreational
16 (approx.)
Recreation
85,000
27
46.42
Single family lots
75,000
Overlook West
No. 1
25
Single family lots (55)
165,000
Overlook West *
15 (approx.)
Single family lots (45)
365,000
66
13.34
Multi-family parcel
200,000
3-13
.7
1 lot, single family
7,800
20-6, 21-6
1.89
2 lots, single family
10,000
57W
1.74
Manufacturing
17,500
3-2, Behrend,
Rural Home
8.62
3 parcels (single family, park)
12,500
TOTAL
302 acres
$ 2,127,800
GLC is an accrual basis taxpayer and employs a fiscal year ending on May 31. The condensed balance sheet of GLC, as of October 31, 1971, with comparative figures for fiscal years ending in 1970 *484 and 1971, is as follows: BALANCE SHEET Assets
October 31, 1971
May 31, 1971
May 31, 1970
Cash $ 47,298 * $ 42,158 $ 12,135
Receivables: Land Contracts
278,000
272,262
273,261
Other Receivables
60,136
119,788
183,589
Investments, Advances (at
cost)
29,377
48,971
48,971
Land (at cost)
713,907
884,731
1,056,998
Buildings, Furniture &
Fixtures, less accumu-
lated depreciation
11,151
11,332
12,740
Other Assets
274
1,094
1,126
Total Assets
$ 1,140,143
$ 1,380,336
$ 1,588,820
Liabilities and Stockholders' Equity
Liabilities: Mortgage Notes Payable $ 400,003 $ 464,415 $ 585,965
Accounts Payable
7,399
20,076
1,092
Special Assessment Liabilities
160,415
232,759
323,198
Development Costs
14,802
86,952
101,489
Accrued Liabilities
76,310
91,030
101,821
Income Taxes-Deferred
106,000
106,000
91,000
Currently Payable
14,437
Escrow Deposits
500
Total Liabilities $ 765,429
$ 1,001,232
$ 1,29,002
Stockholders' Equity: Common Stock $ 500 $ 500 $ 500
Retained Earnings
378,604
378,604
369,318
Net Income Before Taxes
(6,390)
Total Stockholders' Equity $ 372,714 $ 379,104 $ 369,818
Total Liabilities and Stockholders'
Equity
$ 1,138,143
$ 1,380,336
$ 1,588,820
*485 The GLC profit and loss statement for the five-month period ending October 31, 1971, and GLC earnings statements for fiscal years ending in 1968, 1969, 1970, and 1971 are as follows: PROFIT AND LOSS STATEMENT, OCTOBER 31, 1971
Month of
May 1 to INCOME:
October
October 31, 1971
Rentals $ 869.79 $ 4,348.95
Interest
1,258.77
Sales (Gross)
52,500.00
234,500.00
Miscellaneous
67.50
1,102.50
Total Income
$ 53,437.29
$ 241,210.22
EXPENSE: Sales Costs & Expenses
$ 48,921.97
$ 181,244.88
Interest Expense
2,912.08
19,538.30
General & Administrative Expense
8,619.31
42,333.08
Miscellaneous
278.35
4,484.42
Total Expense
$ 60,731.71
$ 247,600.68
PROFIT or (LOSS) - Before Income Taxes
($ 7,294.42)
($ 6,390.46)
EARNINGS STATEMENT
1971
1970
1969
1968
Real estate sales
$ 349,000
$ 321,705
$ 475,707
$ 681,700
Costs and expenses: Cost of sales
184,162
169,267
254,709
224,595
Selling, general and
administrative expenses
144,762
162,619
153,235
238,922
328,924
331,886
407,944
463,517
Income (loss) from operations
20,076
(10,181)
67,763
218,183
Other (expense) income: Interest income
22,646
33,498
30,964
46,521
Rent income
10,634
11,293
11,655
11,905
Other income
18,649
1,425
31,930
859
Interest expense
(59,719)
(69,443)
(75,994)
(63,302)
(7,790)
(23,227)
(1,445)
(4,017)
Income (loss) before income taxes
12,286
(33,408)
66,318
214,166
Income taxes: Currently (refundable) payable
(12,000)
19,000
11,000
119,000
Deferred - net
15,000
(44,000)
22,000
3,000
(25,000)
33,000
119,000
Net income (loss)
9,286
(8,408)
33,318
95,166
Net income (loss) (per share of
common stock outstanding)
23.22
(21.02)
83.29
237.91
Retained earnings: Balance at beginning of year
369,318
377,726
344,408
249,242
Balance at end of year
$ 378,604
$ 369,318
$ 377,726
$ 344,408
*486 GLC paid no dividends during any of its fiscal years ending in 1967 through 1972. Under decedent's will, the residue of his estate was left in equal shares to Oliver A. Grootemaat, his half brother, and Jean Gile, the daughter of his brother, E. H. Grootemaat. The will did not specifically dispose of decedent's 10 percent interest in GLC. As a consequence, that interest in GLC was included in the residue of his estate. When the residue of the estate was divided, Oliver Grootemaat and Jean Gile agreed that decedent's 10 percent interest in GLC should be distributed to Jean Gile and that Oliver A. Grootemaat should receive cash in the amount of $ 45,639.20 to equalize the distribution. The distributions of stock and cash were made accordingly in January 1973. Ultimate Finding of Fact
On November 7, 1971, the date of decedent's death, the value of decedent's stock in GLC was $ 2,750 per share. OPINION This case involves the valuation of 40 shares of stock in Greendale Land Co. (GLC) which decedent owned at his death.These shares represented 10 percent of the outstanding shares of GLC. Petitioner maintains that the value of the stock at decedent's death was $ 1,275 *487 per share, while respondent claims the per share value was $ 4,466.
Section 2031(a)[2] requires that the value of all property owned by a decedent at his death be included in his gross estate. The relevant standard of valuation is the fair market value of the property, defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Section 20.2031-1(b), Estate Tax Regs. Generalized guidelines for valuing the stock of closely held corporations are contained in section 2031(b); section 20.2031-2(f), Estate Tax Regs.; and Rev. Rul. 59-60, 1959-1 C.B. 237. Ultimately, however, valuation is a question of fact and petitioner bears the burden of proof. Rule 142, Tax Court Rules of Practice and Procedure.
GLC is a closely held real estate corporation engaged in the business *488 of developing and selling real estate located in the village of Greendale, Wisconsin, which is a suburb southwest of Milwaukee. This land was originally intended as a Greenbelt area to be developed by the Federal government beginning in the 1930's. In 1965, GLC acquired the remaining undeveloped land in the Greendale project, approximately 1,000 acres. The parcels of land in Greendale constituted the principal asset of GLC.At the time of decedent's death in November 1971, GLC still owned 302 acres that remained to be developed. The parties stipulated the fair market value of each of the parcels of land comprising the 302 acres. Moreover, they are in agreement that the value of the land is the primary determinant of the value of GLC stock. [3] They therefore agree that the aggregate fair market value of the land ($ 2,128,000), plus the book value of the current and other assets ($ 424,236), less the liabilities at book value ($ 765,429), divided by the total number of GLC shares outstanding (400), or the net shareholder equity, which is $ 4,464 per share, is the starting point for valuing the stock. *489 It is at this point that the parties part company. Petitioner maintains that reductions should be made from the amount identified above as the net shareholder equity for the following factors: (1) a 10 percent discount from the fair market value of the individual parcels of land to reflect potential sales commissions; (2) a 34 percent discount from the aggregate fair market value of the individual parcels of land to reflect costs of developing and liquidating the land and the cost of money over the liquidation period; and (3) a 25 percent discount from the net shareholder equity per share for the existence of the 10 percent minority interest in GLC being valued, and a 15 percent discount for the lack of marketability of that interest. Respondent's position is that none of these discounts is allowable. Alternatively, in the event a discount is proper to reflect decedent's 10 percent interest in GLC, respondent claims that the discount attributable to the minority interest is substantially less than the 40 percent petitioner asserts. The evidentiary effect on the value of GLC stock of an agreement regarding the transfer of GLC stock involving two legatees of decedent is *490 also at issue. The effect of each of these factors on the date of death value of GLC stock is considered separately herein. I. Discount for Sales Commissions.
Petitioner maintains that a 10 percent discount should be allowed to reflect the costs incurred in marketing all the parcels of land owned by GLC. Petitioner claims that the application of this discount to the fair market value of the individual parcels of land is the first step in valuing the stock.Respondent, on the other hand, contends that no such discount should be allowed since the definition of fair market value does not require a reduction to reflect such selling costs. The disagreement between the parties on this point is grounded in their differing concepts of fair market value, as applied to these facts. Petitioner argues that sales commissions are a part of the cost of liquidating GLC's land inventory, and as such, constitute an unrecorded liability that will be considered by any potential buyer of the stock. We disagree. In determining the value of land, a prospective buyer looks to the rate of return he could receive on his capital invested in the property through sales of the real estate after *491 all of the expenses of development and disposition are considered. This rate of return in relation to the risk encountered determines the price a willing buyer would pay.Therefore, in the case of commercial land, we think that the selling expenses would have been reflected in the fair market values for the various parcels as stipulated by the parties. Accordingly, no additional discount should be allowed for sales commissions when valuing the stock because such expenses have already been considered. In fact, such construction was acknowledged by petitioner's expert witness. Petitioner argues further that a discount for sales commissions is consistent withRevenue Ruling 59-60, 1959-1 C.B. 237. Section 5(b) of that ruling indicates that in valuing the stock of a real estate holding company, "operating expenses of such a company and the cost of liquidating it, if any, merit consideration when appraising the relative values of the stock and the underlying assets." We are not persuaded that such considerations affect value in this case. In our judgment, and petitioner so argues, GLC is a going concern and has no plans to liquidate. Given the nature of GLC's assets *492 and its activities (undeveloped land, its development and sale), the expenses of selling have already been included in determining the fair market value of the parcels. Moreover, any costs of an unplanned liquidation are simply not appropriate in valuing GLC as a whole. Cf. Estate of Cruikshank v. Commissioner,9 T.C. 162, 165 (1947). [4]
*493 II. Discount for Development and Market Absorption
Petitioner contends that a 34 percent discount from the aggregate of the stipulated fair market values of the parcels of land should be allowed for their development and market absorption. The basis for this claim is that a discount is necessary to reflect the time required for the orderly disposition of the GLC assets, estimated to be 8 years, and the cost of money at 9 percent annually over the entire disposition period. Petitioner alleges that such a period of disposition is necessary to negate an absorption factor. Absorption is a price depressant caused by the disposition of the parcels of land in a short period of time creating competition among the parcels that might not otherwise exist. Respondent views the situation from a different perspective, and contends that any discount for these reasons is improper. Specifically, respondent questions the factual basis for and the legal significance of absorption. Additionally, respondent contends that the alleged discount for the time-cost factor of development is already included in the stipulated fair market values. We believe petitioner is entitled to a discount *494 for absorption. The record is clear that the 302 acres owned by GLC in November of 1971, if valued as a whole, would have a different value than if the values of the individual parcels were totaled. The disposition of all of the parcels of land owned by GLC within a reasonably short period of time would result in the different parcels (or their subdivisions) being in direct competition with each other. An abrupt increase in supply would, assuming demand remains constant, reduce the price for which these parcels or subdivisions would sell. This element of competition, a price depressant, is not taken into account in valuing the parcels individually. We therefore believe a discount for absorption is appropriate. The question therefore becomes quantitative. Petitioner's expert witnesses testified that an orderly development of the parcels of land in Greendale would take between 5 and 10 years. The 34 percent discount was based on the estimate of 8 years for the necessary development of the land and its disposition. We find that the discount of 34 percent is excessive for several reasons. First, petitioner's expert admitted that the stipulated value of some of the parcels having *495 substantial value (particularly parcel number 3) already assumed a delayed development period of from 4 to 5 years. Thus, the fair market value of some of the individual assets of GLC have already been adjusted for absorption. Therefore, an absorption factor for the assets collectively should not be applied to the aggregate of the stipulated values, as petitioner's expert has done, because that duplicates the effect of absorption on value. Rather, the incremental factor of absorption needs to be applied to the parcels individually, where applicable, or the percentage factor that is applied to the aggregate value of the assets must be reduced. In addition, when the fair market value of each parcel was determined individually, it must be assumed that their market value reflected the potential competitive impact of tracts of land owned by other developers. The inability to control price because of the lack of control over the competing land resources would presumably be reflected in the market value of each tract of land. We also have some reservations about the reliability of the 8-year estimate used as the basis for the period required for the orderly development and disposition *496 of the land owned by GLC. The period of 8 years was not based upon the independent judgment of petitioner's expert, but was apparently suggested by GLC management. We also discount petitioner's attempt to establish the uniqueness of the Greendale project as a factor in lengthening the development process. If anything, the considerations that petitioner points to as unique about the project indicate an atmosphere conducive to an efficient development. Finally, the history of the development of Greendale by GLC reveals two important facts: the development and disposition of land in Greendale by GLC through November 1971 proceeded at an average of 100 acres per year; and of the 300 acres still owned by GLC at decedent's death, a small portion of the lots were developed and being offered for sale. These factors indicate that the development period was less than 8 years. The judgment we have been asked to make involves qualitative criteria, and is not amenable to scientific precision. We have, however, carefully considered the entire record, including the factors just discussed.Upon careful consideration of the evidence presented and the testimony given by petitioner's expert witnesses, *497 it is our opinion that petitioner is entitled to a discount for absorption of 15 percent. [5]
Respondent contends that when using the underlying net asset method of valuing stock, no discount from the valuation of the underlying assets to arrive at a gross value for the stock is permissible. To support this position, respondent relies on the following cases: Estate of Nathan v. Commissioner, a Memorandum Opinion of this Court dated July 17, 1946, affd. 166 F.2d 422 (9th Cir. 1948); Bank of California National Association v. Commissioner,133 F.2d 428 (9th Cir. 1943), revg. a Memorandum Opinion of this Court; Estate of Cruikshank v. Commissioner,9 T.C. 162 (1947); Estate of Huntington v. Commissioner,36 B.T.A. 698, 716, 721 (1937); and Estate of Thalheimer v. Commissioner,T.C. Memo. 1974-203, affd. per curiam, 532 F.2d 751 (4th Cir. 1976), cert. denied 429 U.S. 921 (1976). Suffice it to say *498 that value is a factual determination, and the cases cited are distinguishable. Principally, these cases involve investment companies, rather than an operating company as is GLC. These companies were valued on the basis of the underlying assets, consisting largely of marketable securities, with no consideration given to anything analogous to absorption as applied to the particular facts before us. [6] In the two cases involving real estate as the primary underlying corporate asset, the corporation was either not engaged in the development of the property; or the potential effect of absorption (if it was presented at all) was related to a variety of factors that on the particular record involved amounted to pure speculation. Estate of Huntington v. Commissioner,supra, at 706. Obviously, the facts before us are unique and the question of value is one of fact. We are simply not persuaded by any of the cases relied on by respondent that the discount for absorption is inappropriate on the particular facts before us. *499 III. Discounts for Minority Interest and Lack of Marketability
Decedent owned a 10 percent interest in GLC at his death. Petitioner claims that a 40 percent discount from the net value of the equity of decedent's 40 shares is necessary to compensate for the disadvantages in holding a minority interest in GLC. This 40 percent discount is allegedly the combination of two elements, 25 percent for the lack of control, and 15 percent for the lack of marketability of the minority interest. Respondent admits that some discount is allowable in this case for the ownership of a minority interest. However, respondent contends that the discount for lack of control should be limited to a relatively small percentage because the evidence supporting this discount is questionable. Respondent also maintains that no discount is appropriate for lack of marketability.
Based on our evaluation of the entire record, including the testimony and valuation reports submitted by each party's expert, we conclude that a 25 percent discount is appropriate to reflect decedent's ownership of a minority interest and the restricted market for the shares. This conclusion is based on a number of factors, *500 each of which we think would have a depressing influence on value from the perspective of a prospective purchaser of the decedent's shares. First, we are cognizant of the difficulties that can arise in a small closely held corporation whose assets consist primarily of undeveloped real estate. That is, the rate of development of the land, the sales policy, the marketing techniques to be employed, and the rate at which the potential income of the property is to be realized are variables which affect the amount a purchaser would be willing to pay. Secondly, this 10 percent interest is subject to the desires of the majority in ownership. This inability to influence management means that the holder of the minority interest cannot realize any gain until it suits the other's purpose. Moreover, since GLC has never declared any dividends, a potential purchaser of a 10 percent interest cannot reasonably anticipate any return on the investment until the corporation is liquidated. We therefore find that a discount for the minority interest is appropriate. We also feel that a factor of discount should be provided for the restricted market of these 40 GLC shares. GLC is essentially a family *501 owned corporation whose owners have interests in other ventures that aid in the marketing of the developed land in Greendale. Accordingly, given the nature of the business and the inability inherent in this 10 percent interest to influence the direction of the corporation, there is a definite lack of a market for these shares. However, under the circumstances of this case, these two factors are interrelated. Therefore, taking into account all of the factors we have discussed, and based on our valuation of the entire record, a combined discount of 25 percent is appropriate. Respondent's position that a discount of less than 25 percent is appropriate is based on two arguments. First, respondent claims that in a number of cases involving the valuation of real estate development and holding companies, courts have not allowed any discount for a minority interest in the property, citing Estate of Cruikshank v. Commissioner,9 T.C. 162 (1947); Estate of Nathan v. Commissioner, a Memorandum Opinion of this Court dated July 17, 1946, affd. 166 F.2d 422 (9th Cir. 1948); and Richardson v. Commissioner, a Memorandum Opinion of this Court dated November 30, 1943, affd. 151 F. 2d 102 (2d Cir. 1945), *502 cert. denied 326 U.S. 796 (1946). The cases relied on by respondent are inapposite. They are factually distinguishable from the instant case in important respects, and do not provide persuasive authority for respondent's argument. Two of the cases, Cruikshank and Richardson, involved investment companies which primarily held marketable securities. Nathan involved an investment company which held developed real estate for rental. GLC, on the other hand, is a real estate development company, an operating company. Moreover, the opinions in Cruikshank and Nathan do not even disclose whether a minority discount was even at issue. Respondent also asserts that there are numerous errors in the analysis of a 40 percent discount by petitioner's expert, and that the alleged 40 percent discount is not supported by the evidence. We are aware of the deficiencies in both the testimony of the valuation report by petitioner's expert. However, these deficiencies have been considered in our determination that an appropriate discount for the minority interest is 25 percent. IV. Arm's-Lenth Sale
The parties agree that there is no market for these *503 shares and that there were no comparable arm's-length sales. However, petitioner claims that the settlement between the two residuary legatees of the estate, Jean Gile and Oliver Grootemaat, regarding the stock in question represents, in effect, an arm's-length sale and is indicative of fair market value. See section 20.2031-1(b), Estate Tax Regs. We disagree with petitioner. We do not think that this one isolated transaction involving GLC stock, although some indication of value, is particularly dispositive. First, the transaction between Jean Gile and Oliver Grootemaat resulted in a distribution by the estate which occurred approximately 14 or 15 months after decedent's death, too remote in time to be a persuasive indicator of value. More importantly, we do not believe that Oliver Grootemaat was a willing seller of stock within the meaning of the definition of fair market value. See section 20.2031-1(b), Estate Tax Regs. Oliver Grootemaat was obviously a very unwilling owner of the GLC stock. It was an investment over which he, being a resident of Florida, could exercise little or no supervision. Also, being retired, he desired an investment in which he could expect an *504 immediate return. GLC stock promised no such return. Finally, while there may have been no great affection between the two legatees, they were related and there was no animosity or disaffection. While there is nothing to indicate that Oliver Grootemaat desired to make a gift to Jean Gile, we doubt that the same kind of hard bargaining would be present in this context as there might exist between two unrelated parties. Taking all these factors into account, we think the relevance that this transaction has for the valuation of the shares in GLC on the record before us is marginal. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The relationships among GLC's original shareholders were as follows: E. H. Grrotemaat and C. J. Grootemaat, the decedent, were brothers. James E. Grootemaat is the son of E. H. Grootemaat. Gordon Gile is the spouse of Jean Gile, a daughter of E. H. Grootemaat. Robert Eschweiler is the spouse of Joan Eschweiler, a daughter of E. H. Grootemaat. John F. Dill was not related to any of the family. All the shareholders were directors.↩
*. Parcel consists of 45 unsold lots. Development of these lots was completed prior to November 1971, and lots were being offered for sale in November 1971.↩
*. Includes $ 510 held in a Real Estate Trust Account↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect at the time of decedent's death.↩
3. This approach to valuation which emphasizes the value of the underlying assets is the consequence of the absence of comparable sales of GLC stock, and the fact that as a real estate development corporation, earnings of GLC are not an adequate guide to the value of its stock. See Rev. Rul. 59-60 (Sec. 5), 1959-1 C.B. 237↩.
4. Petitioner also relies on Estate of Heckscher v. Commissioner,63 T.C. 485 (1975), acq., to support its argument for the allowance of a 10 percent discount for sales commissions. In Estate of Heckscher, the parties agreed that for the purposes of that case, a 10 percent discount for selling costs of large parcels of undeveloped land (totaling 28,604 acres) was appropriate. Estate of Heckscher does not aid petitioner in this case. An agreement to a fact in a case involving a similar valuation problem does not require us to find the existence of a similar discount here. Moreover, while a discount may have been appropriate in Estate of Heckscher,↩ where the company whose underlying assets were being valued was strictly an investment company which held large parcels of land, such a discount is not appropriate on the facts before us.
5. The discount is to be applied to the aggregate of the stipulated fair market values of the parcels of land, before adjustment for other assets and liabilities of GLC.↩
6. For example in Estate of Cruikshank v. Commissioner,9 T.C. 162 (1947), the parties stipulated the value of securities and real estate held as underlying assets in a closely held corporation. We simply refused to allow a discount for potential sales commissions and taxes attending a sale of underlying assets. This is consistent with our holding herein on commissions, but has nothing to do with absorption. We specifically noted that "The corporation was an investment company and not an operating company. It is hence dissimilar to a venture in which buying and selling are ordinary business operations." 9 T.C. at 165↩.