JACK D. CARR AND LOUISE G. CARR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carr v. Commissioner
Docket No. 607-81.
United States Tax Court
T.C. Memo 1985-19; 1985 Tax Ct. Memo LEXIS 616; 49 T.C.M. (CCH) 507; T.C.M. (RIA) 85019; January 10, 1985. James M. Tingle,James P. O'Neal, for the petitioners. Robert W. West, for the respondent. SHIELDS MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency of $21,708.45 in the Federal gift tax of each petitioner for the calendar quarter ending December 31, 1976. The issue is the value of certain stock in a closely held corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by reference. Petitioners, Jack D. Carr and Louise G. Carr, *617 husband and wife, resided in Montgomery, Alabama, when they filed their petition. The gifts involved in this case occurred on December 20, 1976, when Louise G. Carr gave each of the two children of petitioners 12 shares of common stock in an Alabama corporation known as Warwick Development Company (Warwick). For the calendar quarter ending on December 31, 1976 each petitioner filed with respondent a gift tax return on which they reported the gifts of the stock at $3,000 per share and elected to utilize the gift-splitting provisions of section 2513. [1] In his notice of deficiency respondent determined that the stock had a value of $13,623.50 per share. Warwick was organized in 1939 by C. H. Grayson, the father of Louise G. Carr, and at the time of the gifts all of its 100 shares of stock were owned by his wife, children and grandchildren. Over the years between its organization and the date of the gifts, Warwick's principal business *618 activity consisted of purchasing undeveloped land, subdividing it into lots, installing streets, utilities, and other improvements, and selling the lots either as such or with homes constructed by Warwick. During its entire existence Warwick has never paid a dividend and has been under the control of the Grayson family, primarily C. H. Grayson in the early years and his son, James M. Grayson, Sr., from about 1972. For the five-year period ending on December 31, 1976, Warwick had average annual earnings per share after taxes of $594.51 and average annual weighted earnings per share of $672.59 computed as follows: Year
Net Income
Weight Factor
Weighted Earnings
1972
$ 41,961
1
$ 41,961
1973
52,234
2
104,468
1974
47,409
3
142,227
1975
58,040
4
232,160
1976
97,613
5
488,065
Total
$297,257
$1,008,881
Average
$ 59,451
$ 67,259
Average
Average Weighted
Earnings Per Share
$594.51
Earnings Per Share
$672.59
The balance sheet of Warwick as of December 31, 1976 can be condensed as follows: Assets other than land
$ 239,344
Land
1,467,556
TOTAL ASSETS
$1,706,900
Liabilities
1,086,908
Deferred Income
20,670
Stockholders' Equity
599,322
TOTAL LIABILITIES &
SHAREHOLDERS' EQUITY
$1,706,900
*619 The stockholders' equity shown on the above balance sheet, as well as the average earnings of Warwick for the five years ending on December 31, 1976, are distorted to some extent by the fact that over the years members of the Grayson family have from time to time advanced funds to Warwick at favorable interest rates and have served as officers of the company at no, or at very low, salaries. The value of the stock shown on the gift tax returns of petitioners of $3,000 per share is approximately 50 percent of the book value of such stock as of December 31, 1976. Respondent determined the value of the stock to be $13,623.50 per share by (1) adjusting Warwick's balance sheet of December 31, 1976 so as to reflect what respondent determined to be the total net asset value of the company and (2) reducing the net asset value per share as thus determined by a 25-percent discount for the fact that the market would be unable to absorb all of the company's assets at market value and the fact that the shares being valued represented a minority interest in the company. Respondent's computation is as follows: Fair market value of Warwick real estate
[2] $2,548,848.00
Less: Book value of real estate
[3] 1,331,702.80
1,217,145.20
Add: Shareholders' equity 12/31/76
599,322.00
Net asset value of company
1,816,467.20
Net asset value per share (100 shares)
18,164.67
Less: 25 percent discount
4,541.17
Net asset value per share
$ 13,623.50
*620 At trial, the parties were able to agree as to the value of four of the parcels of real property owned by Warwick on the gift date but these parcels had a total value of only $2,550. They disagreed as to the value of 176 parcels, being three tracts of undeveloped land containing approximately 437 acres plus 173 developed lots. At trial respondent contended that the total value of the unagreed properties was $2,326,100 [4] on the date of the gifts and petitioners contended that the total value was only $1,329,578 for a difference of $996,522. All of the properties in dispute are in Grayson Valley Estates or Grandview Estates, [5] two subdivisions which Warwick and under development in December of 1976. *621 In Grayson Valley Estates, Warwick owned 378 acres of undeveloped land of which 136 acres were leased to Grayson Valley Golf and Country Club, Inc. The lease, dated July 14, 1976, was for a 25 year term commencing on April 1, 1976, at an annual rental of $17,250, with the lessee having an option to purchase the 136 acres at any time during the lease for $2,500 per acre. The balance of the acreage, about 242 acres, adjoined the 136 acres leased to the country club and in 1976 was undeveloped except for 110 lots which had been platted along the golf course. These lots were subject to an agreement between Warwick and C. H. Grayson under which the sum of $5,000 per lot was payable to Mr. Grayson upon their sale. Warwick also owned 93 developed lots in Grayson Valley Estates. Thirty four of the lots were located in the area of the country club and 18 of these were subject to the agreement requiring a payment of $5,000 per lot to C. H. Grayson on their sale. The other 59 lots were located in the Highland Section of Grayson Valley Estates. At the date of the gifts this section had only been open for a short time. The section did not adjoin the country club property and *622 none of the lots were subject to the agreement in favor of C. H. Grayson. In Gardenview Estates, Warwick owned 59.5 acres of rough undeveloped land and 82 developed lots. Near the date of the gifts Warwick and sold approximately four acres of additional undeveloped land in the same area for $100 per acre. The acres sold had no street or road acress and were sold to an adjoining lot owner who did have such access.The 59.5 acres had been listed for sale by Warwick at $100 per acre for some time prior to the valuation date. Twenty one of the developed lots were located in Sectors Five and Six of Grandview Estates. The other 61 were located in Sector Seven. All 82 of the lots were listed for sale by Warwick on the valuation date. At trial both parties introduced expert testimony and appraisal reports as to the value of the disputed properties. A comparison of the two appraisals appears in the following schedule: Respondent's
Petitioner's
Item
Appraisal
Appraisal
Difference
Grayson Valley Estates
Undeveloped Land - 378 acres +/-
136 acres leased to Country Club
$ 341,500
$ 112,778
$228,722
242 acres
972,000
494,400
477,600
Developed Lots
34 lots - near club
59 lots - Highland Section
499,000
399,200
99,800
TOTAL FOR GRAYSON VALLEY
$1,812,500
$1,006,378
$806,122
Grandview Estates
Undeveloped Land
59.5 acres
$ 93,600
[6] $ 5,950
$ 87,650
Developed Lots
21
65,950
61
* $ 420,000
251,300
102,750
TOTAL FOR GRANDVIEW
$ 513,600
$ 323,200
$190,400
GRAND TOTAL
$2,326,100
$1,329,578
996,522
*623 The principal differences in the appraisals made with respect to the properties located in Grayson Valley Estates are as follows: (1) Petitioners' expert first appraised the property leased to the country club at $2,500 per acre, the price at which the club could buy the property, but he then reduced this value for the low rental return of only four percent on the assumption that the lessee would not exercise the option to purchase until the end of the lease because of the very favorable rent. Respondent's expert ignored the lease and appraised the property as if the lease did not exist except for its option price of $2,500 *624 per acre which he adopted as the value of the property. (2) With respect to the 242 acres of undeveloped land, respondent's expert did not reduce his total value for the 110 lots which had been platted along the golf course, each of which was subject to a $5,000 payment upon sale. Petitioners' appraiser took the $5,000 payments into consideration and reduced his total appraisal accordingly. (3) Respondent's expert recognized the $5,000 due with respect to seven of the 34 lots located near the club but failed to do so with respect to the other 11 lots which were admittedly subject to similar payments. (4) Respondent's expert used a 30-percent discount for bulk sale of all of the 93 [7] lots in Grayson Valley while petitioners' expert discounted each lot by 30 percent to 45 percent for market absorption. The principal differences in the appraisals made with respect to the properties located in Grandview Estates are as follows: (1) With respect to the 59.5 acres of undeveloped land, petitioners' expert used $100 per acre for a total of $5,950, *625 the amount at which the acreage was listed for sale by Warwick at the valuation date. Respondent's expert ignored the list price and by using what he considered as comparable sales arrived at a total value of $93,600, for a difference of $87,650. [8]
(2) With respect to the 82 developed lots, petitioners' expert started with Warwick's list price for each lot as of the valuation date and discounted the price for market absorption. The discount used varied from lot to lot with a low of 40 percent to a high of 45 percent, depending upon the size, location, grade, accessibility or any other factor which, in the opinion of the appraiser, affected the disposition of the lot. Here again, respondent's expert ignored the list prices and determined the value from sales he deemed comparable after adjustments. He then applied a discount of 25 percent for a bulk sale or market absorption. Respondent's expert concluded that the 82 lots had a total value of $420,000 while the total value reached by petitioners' expert was $317,250, for a difference of $102,750. *626 If the stipulated value of the agreed properties and the appraisal of petitioners' expert of the unagreed properties, are substituted for the book value of Warwick's land as of December 31, 1976, the net asset value per share of Warwick's stock would be $4,639. If, as contended by petitioners, such net asset value is then discounted by one third for the minority interest represented by the gifts the fair market value of the stock would be $3,093 [9] per share. By using the same method but substituting the appraisal *627 of respondent's expert for the unagreed properties the net asset value would be $14,604 per share. [10] If, as now contended by respondent, no discount is allowable for the minority interest, the fair market value of the stock would be the same, $14,604 per share. OPINION We are again asked to resolve a dispute over the fair market value of property, a process which has been described as "weighing evidence of expert guesswork." Andrews v. Commissioner,T.C. Memo. 1976-106. Prior to and *628 during trial we admonished counsel that a factual issue of this nature is clearly more properly suited to the give and take of the settlement process than adjudication. As stated in Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980): We are convinced that the valuation issue is capable of resolution by the parties themselves through an agreement which will reflect a compromise Solomon-like adjustment, thereby saving the expenditure of time, effort, and money by the parties and the Court--a process not likely to produce a better result. Indeed, each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. The parties, therefore, are well aware of the fact that we may, in an appropriate case, refuse to reach a compromise where one or more of the valuations submitted to us are the result of overzealous advocacy that *629 ignores common sense. We cannot, however, abdicate our responsibility to determine a factual dispute, including fair market value, where as in this case the parties have failed or refused to do so by agreement. To determine the fair market value of property, the standard to be applied is the price at which the property would change hand between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of all relevant facts. Secs. 20.2031-1(b), 25.2512-1, Estate and Gift Tax Regs.; McShain v. Commissioner,71 T.C. 998, 1004 (1979); Estate of Heckscher v. Commissioner,63 T.C. 485, 490 (1975). With respect to value, petitioners have the burden of proof. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). The issue is a factual one to be resolved from all of the relevant evidence. It is also a question of judgment rather than mathematics. Hamm v. Commissioner,325 F.2d 934, 940 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; *630 Duncan Industries, Inc. v. Commissioner,73 T.C. 266 (1979). Therefore, by its very nature, valuation is an approximation derived from all the evidence. Halvering v. Safe Deposit Co.,316 U.S. 56 (1942); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. See Palmer v. Commissioner,523 F.2d 1308 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Anderson v. Commissioner,250 F.2d 242 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. Furthermore, while the entire record must be considered, we have broad discretion to determine that facts are most important in reaching a determination because "finding market value is, after all, something for judgment, experience, and reason on the part of the trier, and does not lend itself to dissection and separate evaluation." Colonial Fabrics v. Commissioner,202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court. In making our determination we *631 have the right, of course, to rely upon the opinion of experts. Estate of O'Connell v. Commissioner,640 F.2d 249 (9th Cir. 1981), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; Palmer v. Commissioner,supra;Estate of Piper v. Commissioner,72 T.C. 1062 (1979). Opinion evidence, however, must be weighed in the light of the expert's qualifications and with regard to all other relevant evidence. Anderson v. Commissioner,supra.In doing so, we may embrace or reject expert testimony if, in our best judgment, such action is proper. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner, supra at 933; Palmer v. Commissioner,supra at 1310. If warranted, we may choose the opinion in toto of one expert at the expense of another or others. However, if we are satisfied that a significant error exists in the expert testimony we find most persuasive, an appropriate adjustment should and will be made. Buffalo Tool & Die Mfg. Co. v. Commissioner,supra. After *632 observing the expert witnesses and carefully reviewing their valuation reports and exhibits, we find, in the case before us, that petitioners' valuation of the real estate without regard to discounts is fair and reasonable. We are satisfied, however, that the discounts used by petitioners for both market absorption at the corporate level and the minority interest factor at the stockholder level are somewhat excessive. Valuation of Properties
We agree with respondent that the initial step in the valuation of the stock in Warwick is to value its underlying assets. [11] Petitioners apparently also agree because they have stipulated as to the correct value of all of the assets of Warwick except certain land and lots in Grayson Valley Estates and Gardenview Estates with respect to which both parties have submitted expert testimony and reports. *633 With regard to Grayson Valley Estates, the appraisal of petitioners' expert, Thomas E. Young, of the 136 acres leased to the country club is based primarily upon the 25 year lease. Under the lease the lessee had an option at the date of the gifts to purchase the land for $2,500 per acre at any time during the 25-year term. The lessee, however, also had the right to continue the lease for the same 25 years at an annual rental of $17,250. The annual rental represented a return of only about 4 percent on the total option price. A rate of 4 percent was considerably below the average rate of return of about 12 percent which was in effect at the valuation date. Therefore, Mr. Young concluded that based upon the low rent the value of the acreage subject to the lease was only $112,778. Under the circumstances we conclude that Mr. Young's approach and conclusion are fair and reasonably correct. At the valuation date the highest possible value for the acreage would have been the option price. In fact, the option price determined its highest value to Warwick for the next 25 years. Nevertheless, the lessee had the further right to possession of the property during the 25 years *634 at a rental rate which indicated a value of only $112,778. Respondent's expert ignored the low rate of return for the 25 years and without any reasonable explanation concluded that the acreage had a value equal to the option price. Mr. Young appraised the other 242 acres of undeveloped land in Grayson Valley Estates at a total of $494,000 after taking into consideration the $550,000 which was due and payable on sale with respect to the 110 platted lots along the golf course under the agreement by Warwick with C. H. Grayson. This acreage was appraised at a total of $972,000 by respondent's expert, Gene Dilmore. However, Mr. Dilmore did not consider the payments due Mr. Grayson on the sale of the 110 lots. [12] From the record as a whole we have found that the 110 lots were subject to the agreement between Warwick and Mr. Grayson and consequently Mr. Young's appraisal of this item is also fair and reasonable. *635 With respect to the developed lots in Grayson Valley Estates the only substantial difference between the two appraisals is the failure of Mr. Dilmore to consider 11 of the 18 lots which were subject to the $5,000 payment due Mr. Grayson. This accounts for $55,000 of the total difference of $99,800. The remaining difference is due to the fact that petitioners' expert applied a discount for market absorption which ranged from 30 percent to 45 percent while the discount used by respondent's expert was limited to 30 percent. With respect to both the undeveloped land and the developed lots in Gardenview Estates, we are at a loss to understand why respondent's expert elected to ignore the prices at which these properties were listed for sale by Warwick and to determine a value before discount by using what he considered as comparable sales with the usual adjustments for differences in time, size, and location. Petitioners' expert started with the verified list prices which were further corroborated by some actual sales and proceeded to apply his discount for market absorption to arrive at appraised value. It appears that the only logical explanation for respondent's failure *636 to refer to list prices would be that due to the failure of the parties to cooperate in the preparation for trial, the list prices were not available to respondent's expert at the time he prepared his report. In any event, we are unable to find that the beginning point in determining the fair market value of the property is in excess of the price at which the owner had it listed for sale to the public. Consequently, we agree with Mr. Young that the list price is a fair and reasonable value before any discount for market absorption. Discount For Market Absorption
Petitioners' expert used a 30-percent to 45-percent discount with respect to each of the developed lots in Grayson Valley for market absorption. He used a 40-percent to 45-percent discount for each of the lots in Grandview. His percentage varied from lot to lot because of differences in the size, location, and other factors affecting disposition of the property. We agree with petitioners that a discount of this nature is necessary in order to reflect the absence of time within which to make an orderly disposition of the property.It is apparent that all of the lots owned by Warwick in December of 1976, if valued *637 as a whole, would have a different value than if the value of the individual lots were totalled. The disposition of all of the lots at once or within a short period of time would result in the different lots (or their subdivisions) being in direct competition with each other. Such an abrupt increase in supply with demand remaining constant would reduce the total price for which the lots would sell. This element of competition is a price depressant which is not present in valuing the parcels individually. Consequently, a discount of some amount for absorption is appropriate with respect to all of the lots. See Estate of Grootemaat v. Commissioner,T.C. Memo. 1979-49. Respondent's expert admits that such a discount is proper. In fact he discounted the lots in Grayson Valley by 30 percent and those in Grandview by 25 percent. From the record as a whole we believe that 30 percent is a fair and reasonable discount for all of the developed lots. Discount for Minority Interest
The subject of each of the gifts involved in this case represents a relatively *638 minor interest in Warwick. At the date of the gifts and since the organization of the corporation the balance of the stock was owned by other members of the Grayson family. Petitioners contend that under these circumstances the net asset value of the gifted stock should be discounted by one-third not only because it represents a minority interest but also because the past history of the corporation clearly indicated to any prospective purchaser of the stock that the corporation did not pay dividends and that it was under the exclusive control of the senior members of the Grayson family. In support of their contention petitioners called Mr. Frank W. Whitehead, Warwick's certified public accountant, who testified that from his many years of experience in practicing accounting which included numerous evaluation problems in Alabama he was of the opinion that a discount of one-third for the minority interest would be reasonable in this case because of the lack of any control over the corporation's affairs by the minority interest and the near absence of any market for a minority interest in such a small closed corporation. At trial and on brief respondent contended that *639 no discount for the minority interest is appropriate in this case. We, however, are cognizant of the difficulties that can arise in the valuation of stock in a small closely held corporation, especially where as here, all or almost all of the assets consist of undeveloped real estate. In such cases the rate of development of the land, the sales policy of the company, and its marketing techniques will obviously affect the rate at which the potential income from the property will be realized. Moreover all of these variables will affect the amount a purchaser would be willing to pay for stock in the company and if the stock being purchased represents only a minority interest the purchaser will be subject to, if not at the mercy of, the desires of the majority in ownership. The inability to influence management would mean that the holder of the minority interest could not realize any gain until it suited the majority's purpose. Furthermore, in view of Warwick's history with respect to dividends a potential purchaser of a minority interest could not reasonably anticipate any return on his investment until the corporation was liquidated. Control of the company would continue *640 to be in the members of one family who have other financial interests and other means of support. Given the nature of the business and the inability of a minority interest to influence the direction of the corporation it is obvious that the market, if any, for a minority interest of this nature would be substantially limited. We agree with petitioners, therefore, that a discount for the minority interest is justified in this case. From the record as a whole and using our best judgment we conclude that the discount for the minority interest in this case is limited to 25 percent of the net asset value of the stock. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.↩
2. At trial respondent adjusted this figure downward to $2,326,100, the value found by his appraiser. ↩
3. The record contains no explanation for the difference between this figure and the book value of $1,467,556 of the land as shown on the balance sheet.↩
4. On brief respondent conceded that this figure should be further reduced to $2,275,000 after adjustments for properties included in his appraisal which were not owned by Warwick on the gift date. ↩
5. From time to time both parties referred to this subdivision as Gardendale or Gardendale Estates.↩
6. At trial respondent moved to strike the testimony and report of petitioners' expert with respect to this property on the ground that the expert had appraised the wrong property. Ruling was reserved on the motion to strike but after examining the transcript we are satisfied that the question arose because the witness was momentarily confused during cross-examination and the matter was cleared up on re-direct. Therefore, the motion to strike is denied.↩
*. Respondent incorrectly used 80 lots at $5,250 to arrive at his total value of $420,000. ↩
7. Respondent's expert erroneously used a total of 94 lots which accounts for part of the difference in the appraisals.↩
8. A small part of the difference is attributable to the fact that respondent's expert erroneously used 62.5 acres in his computation.↩
9. The computation is as follows: Stipulated Value of Agreed Properties
Petitioners' computation failed to include this item. Its inclusion adds only $25 to the net asset value per share and only $8 to the fair market value.
*↩ $ 2,550 Petitioners' Appraisal of Unagreed
Properties
1,329,578 Total Value of Properties
$1,332,128 Less Book Value of Properties (12/31/76)
1,467,556 Adjustment
(135,428)
Add Shareholders' Equity (12/31/76)
599,322 Net Asset Value (100 Shares)
463,894 Net Asset Value Per Share
4,639 Less Discount for Minority Interest (1/3)
1,546 Fair Market Value Per Share
3,093 10. The computation is as follows: Stipulated Value of Agreed Properties
$ 2,550
Respondent's Appraisal of Unagreed
Properties
On brief respondent conceded that this figure should be further reduced to $2,275,000 after adjustments for properties included in his appraisal which were not owned by Warwick on the gift date.
*↩ 2,326,100
Total Value of Properties
$2,328,650
Less Book Value of Properties (12/31/76)
1,467,556
Adjustment
861,094
Add Stockholders' Equity (12/31/76)
599,322
Net Asset Value (100 Shares)
1,460,416
Net Asset Value Per Share
14,604
Less Discount for Minority Interest
Fair Market Value Per Share
14,604
11. In support of their respective computations both parties submitted expert testimony and reports in which attempts were made to arrived at a value for Warwick's stock by comparing it to publicly held companies. In this respect, respondent on brief renewed his objection to the testimony and report of petitioners' expert on this point because a copy of the expert's report had not been furnished to respondent or the Court in accordance with the rules. The testimony and report were admitted and considered, however, because neither party had complied with the rules by furnishing the Court with copies of their appraisal reports at least 15 days before trial. Furthermore, respondent later submitted similar testimony by his agent without complying with the rules. In any event the question is considered moot because we are unable to find that any one of the public companies selected by either party is comparable to Warwick.↩
12. Respondent's treatment of the $5,000 payments is inconsistent. He recognized such payments in full with respect to 7 of the 34 developed lots near the golf course but without any explanation refused to recognize such payments on another 11 lots which he stipuated were subject to such payments.He also refused to recognize the payments on the 110 platted lots.↩