T.C. Memo. 1999-129


UNITED STATES TAX COURT


ESTATE OF LYNN M. RODGERS, DECEASED, FIRST NATIONAL BANK OF
COMMERCE, EXECUTOR, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL
REVENUE, Respondent


Docket No. 761-92.                        Filed April 20, 1999.


<u>Edward D. Wegmann</u> and <u>David F. Edwards</u>, for petitioner.

<u>Linda K. West</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined a deficiency of

$3,754,683.92 in petitioner's Federal estate tax (estate tax).

The sole issue remaining for decision is the fair market value of

the interest that Lynn M. Rodgers (decedent) owned on the date of

his death in Marrero Land and Improvement Association, Limited

(Marrero Land or the Company). We find that the fair market value of that interest on that date is $4,316,920.

FINDINGS OF FACT

Most of the facts have been stipulated and are so found.

On February 7, 1988 (the valuation date), decedent died testate at the age of 90. First National Bank of Commerce, the executor of decedent's estate (executor), had its principal place of business in New Orleans, Louisiana, at the time the petition was filed.

At the time of his death, decedent owned, inter alia, an interest in 166-2/3 shares of stock of Marrero Land. That interest was represented by voting trust certificate No. one (voting trust certificate) which was issued and governed by the Rodgers-Barkley voting trust and which represented as of the valuation date one-third of the outstanding stock of the Company. (We shall refer to decedent's voting trust certificate for 166-2/3 shares of the stock of Marrero Land as decedent's interest in Marrero Land.)

Marrero Land, which was incorporated under the laws of Louisiana on December 6, 1904, has been a closely held corporation engaged principally in the business of acquiring, developing, managing, improving, maintaining, leasing, and selling real estate located principally within the greater New Orleans metropolitan area. Since its incorporation, Marrero Land has been

owned and actively operated as a family enterprise, with the only stockholders being descendants by blood or marriage of its original stockholders who were Louis Herman Marrero, Sr., and his three sons, Louis Herman Marrero, Jr., William Felix Marrero, and Leo A. Marrero. (We shall refer to the descendants by blood or marriage of the original stockholders of Marrero Land as Marrero family members.)

At the time Marrero Land was incorporated, article VI of its articles of incorporation (article VI) provided:

> No stockholder shall have the right to sell or transfer any share or shares of the capital stock of the said corporation owned by him until the expiration of fifteen days, after given [sic] written notice to the other stock holders who will have the privilege of purchasing the same during said fifteen days at the actual cash value thereof, as established by the books of the corporation.

Around 1980, N. Buckner Barkley, Jr. (Mr. Barkley) and Keith M. Hammett (Mr. Hammett), who were not members of decedent's immediate family and who were at the time members of the board of directors and the executive vice president and the treasurer, respectively, of Marrero Land, had concerns regarding Louis Marrero, IV (Mr. Marrero), who was then president of Marrero Land. That was because, inter alia, Mr. Marrero had pledged the Marrero Land stock which he owned in order to secure certain of his personal obligations, and Mr. Barkley and Mr. Hammett believed that that stock might be sold to satisfy Mr. Marrero's

personal debts, in which event persons who were not Marrero family members would become stockholders of Marrero Land.

Principally because of the foregoing concerns, Mr. Barkley initiated steps to amend article VI, which did not specifically address the situation in which the stock of one of the Company's stockholders was to be sold in order to repay the debt of that stockholder. Mr. Barkley asked Graham Stafford (Mr. Stafford), Marrero Land's attorney, to review article VI, advise the Company what it should do in order to address the concerns that persons who were not Marrero family members might become stockholders, and provide suggestions to the Company with respect to updating and modernizing the language of article VI.

Mr. Stafford, working with Mr. Barkley, recommended that the Company's stockholders amend article VI to provide as follows:

a - All sales, assignments, exchanges, transfers, donations, or other dispositions of the shares of the capital stock of this corporation shall be made on the books of the corporation and in accordance with this Article VI. Each share of the capital stock of this corporation is issued on the condition that any transfer in violation of this Article VI shall be void and the corporation shall be under no obligation to transfer such shares on its books, pay dividends to, or otherwise regard the holder thereof as a shareholder of this corporation. Each certificate of stock representing shares of this corporation shall bear a legend making reference to this Article VI.

b - If any shareholder of the corporation desires to sell, assign, exchange, transfer, donate, or otherwise dispose of shares of the capital stock of the corporation, he shall first offer such shares to the corporation by giving written notice to the corpora-

tion.  Upon receipt of such notice, the corporation shall send a copy of such notice to all shareholders. For a period of forty-five (45) days after the corporation receives notice from the selling shareholder, the corporation shall have an option to purchase all the shares offered at the book value of the shares. The forty-five (45) day period during which the corporation shall have the right to purchase the shares shall be referred to as the "first option period".

c - If the corporation fails or refuses to purchase the shares offered within the first option period, the selling shareholder shall next offer such shares to the other shareholders of the corporation, and they, or any of them, shall have a second option to purchase all such shares at their book value.  If more than one shareholder desires to purchase the shares, such shareholders shall have the option to purchase the shares offered in the proportion that the number of shares registered in their respective names bears to the total number of shares registered in the names of all shareholders who desire to purchase such shares. Each shareholder shall have thirty (30) days after the date of the first option period expires within which to notify the corporation in writing of the number of shares he desires to purchase and shall attach a certified check, made payable to the corporation, in an amount equal to the book value of the number of shares he desires to purchase.  The checks of all shareholders shall be held in escrow by the corporation pending the closing.  Within forty (40) days of the termination of the first option period, the corporation shall notify the selling shareholder whether the second option has been exercised by the shareholders and shall otherwise comply with the provisions of subparagraph e of this Article VI.

d - For purposes of this Article VI, the "book value" shall mean the value of the shares as shown on the books of the corporation as of the date shown on the corporation's most recent annual audit.  Such determination of book value shall be made by the firm of certified public accountants who performed the corporation's most recent annual audit and shall be made in accordance with generally accepted accounting principles, with no value attributable to good will.

e - Acceptance of any offer to sell shall be made by the corporation giving written notice to the selling shareholder, accompanied by a certified check for the full amount of the purchase price, and such acceptance, when accompanied by tender of the certified check shall constitute a sale of the shares and shall entitle the purchasers(s) to have the stock certificate for the shares delivered, properly endorsed with signatures guaranteed for all of the shares sold. The closing of the sale and the transfer of the shares shall take place at the registered office of the corporation within fifteen (15) days of the acceptance. The date and time of the closing shall be set forth in the written notice of acceptance.

f - If a shareholder offers shares of this corporation first to the corporation and then to the shareholders in accordance with this Article VI, and neither the corporation nor the shareholders shall accept such offer, then, for a period of twelve months following the expiration of the shareholders' second option period, such shareholder shall be free to sell, assign, exchange, transfer, donate or otherwise dispose of the shares in any manner and upon such terms and conditions as he may deem appropriate, and such transfer shall be recognized on the books of the corporation.

g - The donation _inter_ _vivos_ of shares of the capital stock of the corporation or any transfer of such shares following the death of a shareholder shall be subject to the provisions of this Article VI unless such shares shall be transferred to the spouse, children, or other lawful descendants, or the spouse of any child or lawful descendant, or the father or mother, or other lawful ascendant, or the collateral relations of the shareholder, whether outright, in trust, or to any other legal entity established for the exclusive benefit of any of the foregoing persons; provided, however, that the corporation shall not be required to record and honor such transfer, except upon receipt of written notice of such transfer.

h - Notwithstanding any other provision of this Article VI, a shareholder shall have the right to sell all or part of his shares to, or exchange such shares with, his spouse, children, or other lawful descendants, or the spouse of any child or lawful descendant,

or the father, mother, or lawful ascendant, or the collateral relations of the selling shareholder, whether outright, in trust, or to any other legal entity established for the exclusive benefit of any of the foregoing persons; provided that such sale or exchange is made for a price or consideration of no more than the book value of the shares, and provided, further, that the corporation shall not be required to record and honor such transfer except upon receipt of written notice of such transfer.

i - In the event any shareholder pledges or hypothecates the shares of the capital stock of this corporation to secure an obligation, and subsequently defaults on such obligation, the creditor, before enforcing any of its rights with respect to such shares, shall immediately notify the corporation and the defaulting shareholder, and for a period of forty-five (45) days after the receipt of such notice, the corporation shall have the option to purchase all of the shares so pledged or hypothecated for the book value of the shares. If the corporation fails or refuses to purchase all the shares during the first option period provided, the shareholders shall have a second option to purchase the shares in accordance with subparagraph c of this Article VI; provided, however, if the shareholder who pledged or hypothecated his shares shall cure the default on his obligation with the creditor prior to the time the corporation or the shareholders exercise their option to purchase the shares, the option to purchase such shares shall terminate. If either the corporation or the shareholders purchases such shares, the purchase price shall be paid jointly to the defaulting shareholder and the creditor. If neither the corporation nor the shareholders purchases all the shares so offered, then for a period of twelve (12) months following the expiration of the shareholder's second option period, the creditor shall be free to exercise its security rights and sell, assign, exchange, transfer, or otherwise dispose of such shares in any manner and upon such terms and conditions as he may deem appropriate, and such transfer shall be recognized on the books of the corporation. In the event of a sale or transfer of any shares of the capital stock of this corporation made by or at the instance of any mortgagee, pledgee, creditor, bankruptcy trustee or receiver of any shareholder,

- 8 -

without first complying with the provisions of this Article VI, whether such sale or transfer be public or private, judicial or otherwise, the party acquiring such shares shall offer the shares so purchased to the corporation and to the shareholders thereof at book value pursuant to the terms and conditions of this Article VI, and if the corporation fails or refuses within the first option period provided and the share- holders fail or refuse within the second option period provided to purchase all the shares so offered, the shares may be transferred to the party acquiring the shares, and such transfer shall be recognized on the books of the corporation.

j - The failure or refusal of the corporation or the shareholders to strictly enforce the provisions of and exercise their rights under this Article VI shall not be construed nor operate as a waiver of, and shall be entirely without prejudice to their right to enforce such provisions and exercise their rights under this Article VI.  Notwithstanding any other provision of this Article VI, shareholders owning at least 80% of the capital stock of the corporation may waive the provisions of this Article VI by executing a written consent.

In recommending that the stockholders of Marrero Land adopt the foregoing amendment to article VI, Mr. Barkley did not intend to change the price at which that Company's stock was to be purchased under such amended article from the price at which such stock was to have been purchased under article VI.  On January 23, 1980, the stockholders of Marrero Land, who did not include decedent's spouse or children, adopted a resolution authorizing the foregoing amendment to article VI (amended article VI).  On February 6, 1980, that resolution became effective.  In accor- dance with La. Rev. Stat. Ann. sec. 12:57 (West 1994), a legend appears on each of the outstanding stock certificates of Marrero

Land, which restates the substance of the restrictions on the transfer of the Company's stock that are contained in amended article VI.

No appraisal of the Marrero Land stock was obtained prior to the adoption in 1980 of amended article VI. That was because Mr. Barkley and Mr. Hammett saw no reason to obtain such an appraisal since the use of book value under amended article VI, which was readily determinable by the Company's certified public accountants who audited its books each year, provided for a precise determination of the price at which stock was to be purchased under that article. The use of book value in amended article VI also eliminated, as far as the Company and its stockholders were concerned, the costs and uncertainties associated with establishing a price for the stock of Marrero Land through an appraisal or another method every time that there was a transfer of such stock.

Even after the adoption of amended article VI, there was dissension among the Company's stockholders about Mr. Marrero's role in its management. Mr. Barkley and certain other stockholders wanted to remove Mr. Marrero as president. In an effort to unite the voting power in Marrero Land of Mr. Barkley and decedent, Mr. Barkley met with decedent and suggested that a voting trust be formed, which would allow Mr. Barkley to vote the stock of the Company that decedent owned. Decedent agreed. On

January 19, 1981, Mr. Barkley and decedent entered into the Rodgers-Barkley voting trust (voting trust) to which (1) decedent transferred the 166-2/3 shares of Marrero Land stock that he owned and (2) Mr. Barkley transferred one share of the Company's stock that he owned. At all relevant times, Mr. Barkley has been the sole trustee of the voting trust. As such, Mr. Barkley has had the sole right to vote the stock of Marrero Land held in the voting trust. Pursuant to the terms of the voting trust agreement, the voting trust was to remain in force until January 19, 1996, at which time the duration of the voting trust could be extended for an additional period of up to ten years upon the approval of "registered owners of Voting Trust Certificates representing not less than a majority of the total number of Shares deposited".

After the voting trust was created and decedent transferred to it all of the stock of Marrero Land that he owned, Mr. Barkley succeeded in effecting management changes in the Company. Mr. Marrero was asked to, and did, resign as president of Marrero Land, and, on April 8, 1981, Mr. Barkley was elected the Company's president.

Since the adoption in 1980 of amended article VI until the time of trial in this case, there have been two occasions on which the provisions of that article became operative. The first instance occurred in 1987 when Catherine Cleary Richard (Ms.

Richard), who owned 5/9ths of one share of the Company's stock, sought to sell that fractional share interest. Pursuant to amended article VI, Ms. Richard offered to sell it to Marrero Land. The Company exercised its right under that article and, on March 24, 1987, purchased Ms. Richard's fractional share interest in Marrero Land at book value.

The second occasion on which the provisions of amended article VI became operative occurred in 1988, when James Cleary, Jr. (Mr. Cleary), who owned 5/9ths of one share of the Company's stock, sought to sell that fractional share interest. Pursuant to the provisions of amended article VI, he offered to sell it to Marrero Land. The Company exercised its right under that article and, on October 31, 1988, purchased Mr. Cleary's fractional share interest in Marrero Land at book value.

According to the audited financial statements of Marrero Land, the book value of Marrero Land's equity as of the valuation date was $12,936,054, and the book value of decedent's interest in that equity was $4,316,920.[1] Except for the real properties identified in the following table and referred to herein as remaining unimproved real properties, the following table shows the fair market values of Marrero Land's assets as of the valuation date:

---

[1]This figure was rounded.

| | |
|---|---|
| Assets other than real properties | $11,024,000 |
| Improved and leased real properties | 26,398,433 |
| Unimproved real properties: | |
|   Plantation Estates | 2,450,000 |
|   Destrahan Division Wetlands | 4,100,000 |
|   Fairfield Plantation | 3,242,568 |
|   Barkley Estates - residential portion, not including commercial portion | 2,395,286 |
|   Whitehouse Plantation | 1,032,831 |
|   Remaining unimproved real properties | 20,366,470 |
| Total | 71,009,588 |

The fair market value of each of the unimproved real properties other than the remaining unimproved real properties that are identified in the foregoing table was calculated by using a discounted cash-flow analysis which included a discount for market absorption (absorption discount) and marketing.  The dollar figure that is shown in the foregoing table for the remaining unimproved real properties is the aggregate value as of the valuation date of those properties to which the parties stipulated and which was determined by ascertaining the value of each such property without taking into account an absorption discount.

As of the valuation date, neither decedent's spouse nor any of his children was a stockholder of Marrero Land, and there was no plan to sell or liquidate Marrero Land.  It was anticipated as of that date that the highest and best use of at a minimum approximately 75 percent of the remaining unimproved real properties was to sell them.

On November 7, 1988, the executor timely filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (estate tax return), on behalf of decedent's estate (estate). The executor reported in the return that the fair market value of decedent's interest in Marrero Land on the valuation date was $4,312,018.

Respondent issued a notice of deficiency (notice) to the estate and the executor. Respondent determined in the notice that the fair market value of decedent's interest in Marrero Land on the valuation date was $13,100,000.

The executor timely filed Form 843, Claim for Refund and Request for Abatement (refund claim), on behalf of the estate. The executor reported in the refund claim that the fair market value of decedent's interest in Marrero Land on the valuation date was $2,400,000, and not the value reported in the estate tax return, and that consequently the estate was entitled to a refund of Federal estate tax.

OPINION

The estate modified the position that it took in the refund claim as to the fair market value of decedent's interest in Marrero Land on the valuation date. The estate now claims that the fair market value of that interest on that date is between $3,486,167 and $3,933,412. In the alternative, the estate contends that the maximum fair market value of decedent's in-

terest in Marrero Land on the valuation date is its book value, or $4,316,920, because amended article VI controls the value of that interest for estate tax purposes.

Respondent modified the determination in the notice as to the value of decedent's interest in Marrero Land on the valuation date. Respondent now contends that the fair market value of that interest on that date is $7,700,000.

The value of decedent's gross estate is to be determined by including the value at his death of all of his property, real or personal, tangible or intangible, wherever situated. See sec. 2031(a).[2] The value of every item of property includible in decedent's gross estate is its fair market value on the valuation date. See sec. 20.2031-1(b), Estate Tax Regs. Section 20.2031-1(b), Estate Tax Regs., defines the term "fair market value" as

> the price at which the property would change hands
> between a willing buyer and a willing seller, neither
> being under any compulsion to buy or to sell and both
> having reasonable knowledge of relevant facts. * * *
> All relevant facts and elements of value as of the
> applicable valuation date shall be considered in every
> case. * * *

The willing buyer and the willing seller to which section 20.2031-1(b), Estate Tax Regs., refers are hypothetical persons, rather than specific individuals or entities, and the individual

---

[2]All section references are to the Internal Revenue Code in effect on the valuation date. All Rule references are to the Tax Court Rules of Practice and Procedure.

characteristics of those hypothetical persons are not necessarily the same as the individual characteristics of the actual seller and the actual buyer. See Estate of Curry v. United States, 706 F.2d 1424, 1428, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998). The hypothetical willing buyer and the hypothetical willing seller are presumed to be dedicated to achieving the maximum economic advantage. See Estate of Curry v. United States, supra at 1428; Estate of Davis v. Commissioner, supra; Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).

In the case of unlisted stock, like the stock of Marrero Land, the price at which sales of stock are made in arm's-length transactions in an open market is the best evidence of its value. See Champion v. Commissioner, 303 F.2d 887, 893 (5th Cir. 1962), revg. and remanding T.C. Memo. 1960-51; Estate of Davis v. Commissioner, supra. In the instant case, the record does not disclose any such sales of Marrero Land stock.

Where the value of unlisted stock cannot be determined from actual sale prices, its value generally is to be determined by taking into consideration the company's net worth, prospective earning power, and dividend-paying capacity, as well as other relevant factors, including the company's good will, its position in the industry, its management, the degree of control of the

business represented by the block of stock to be valued, and the values of securities of corporations engaged in the same or similar lines of business that are listed on a stock exchange. See sec. 20.2031-2(f)(2), Estate Tax Regs. Section 4 of Rev. Rul. 59-60, 1959-1 C.B. 237, 238-242, sets forth criteria that are virtually identical to those listed in section 20.2031-2(f)(2), Estate Tax Regs., and "has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value". Estate of Newhouse v. Commissioner, supra at 217. Section 5 of Rev. Rul. 59-60, 1959-1 C.B. 242-243, which addresses the weight to be given the relevant factors depending on the nature of the company's business, provides in pertinent part:

> (a) Earnings may be the most important criterion of value in some cases whereas asset value will receive primary consideration in others. In general, the appraiser will accord primary consideration to earnings when valuing stocks of companies which sell products or services to the public; conversely, in the investment or holding type of company, the appraiser may accord the greatest weight to the assets underlying the security to be valued.

Regardless whether the corporation whose stock is being valued is seen primarily as an operating company or primarily as an investment company, the Courts should not restrict consideration to only one approach to valuation, such as capitalization of earnings or net asset value. See Hamm v. Commissioner, 325 F.2d 934, 941 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Andrews v. Commissioner, 79 T.C. 938, 945 (1982). The degree

to which a corporation is actively engaged in producing income rather than merely holding property for investment should influence the weight to be given to the values arrived at under different valuation approaches. However, it should not dictate the use of one approach to the exclusion of all others. See Estate of Andrews v. Commissioner, supra.

There is no fixed formula for applying the factors that are to be considered in determining the fair market value of unlisted stock. See Hamm v. Commissioner, supra at 938; Estate of Davis v. Commissioner, supra at 536. The weight to be given to the various factors in arriving at fair market value depends upon the facts of each case. See sec. 20.2031-2(f), Estate Tax Regs. As the trier of fact, we have broad discretion in assigning the weight to accord to the various factors and in selecting the method of valuation. See Estate of O'Connell v. Commissioner, 640 F.2d 249, 251-252 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191; Estate of Davis v. Commissioner, supra at 537; see also sec. 20.2031-2(f), Estate Tax Regs.

The determination of the value of closely held stock, like the stock of Marrero Land in which decedent held an interest on the valuation date, is a matter of judgment, rather than of mathematics. See Hamm v. Commissioner, supra at 940; Estate of Davis v. Commissioner, supra. Moreover, since valuation is necessarily an approximation, it is not required that the value

that we determine be one as to which there is specific testimony, provided that it is within the range of figures that properly may be deduced from the evidence.  See Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178; Estate of Davis v. Commissioner, supra.

We turn first to the parties' dispute over the fair market value of decedent's interest in Marrero Land on the valuation date without regard to the estate's alternative position regarding amended article VI.  As is customary in valuation cases, the parties rely extensively on the opinions of their respective experts to support their differing views about the fair market value on the valuation date of decedent's interest in Marrero Land.  The estate relies on (1) Patrick J. Egan (Mr. Egan), a general real estate appraiser certified by the State of Louisiana, who is executive vice president and a partner of Latter & Blum, Inc./Realtors (Latter & Blum), located in New Orleans, Louisiana, and director of the Robert W. Merrick appraisal division of Latter & Blum, and whom the Court qualified as a real estate valuation expert; (2) Charles H. Stryker (Mr. Stryker), who is the managing director of the valuation advisory services of the metropolitan New York office of KPMG Peat Marwick, and whom the Court qualified as a stock valuation expert; and (3) David Chaffe III (Mr. Chaffe), who is the founder and the president of the investment banking firm of Chaffe & Associates,

Inc., located in New Orleans, Louisiana, and whom the Court qualified as a stock valuation expert.  Respondent relies on (1) Frederick M. Guice, Sr. (Mr. Guice), a general real estate appraiser certified by the State of Louisiana, who is employed by Stephen L. Guice & Co., Inc., a real estate broker and appraisal company located in New Orleans, Louisiana, and whom the Court qualified as a real estate valuation expert; and (2) Philip W. Moore (Mr. Moore), who is chairman of Moore Associates Valuations, located in Jacksonville, Florida, and whom the Court qualified as a stock valuation expert.  Each of the experts prepared an initial expert report (expert report) and a rebuttal expert report (rebuttal report).[3]

We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record.  See Anderson v. Commissioner, supra at 249; Estate of Davis v. Commissioner, 110 T.C. at 538.  We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'"  Sammons v. Commissioner, 838 F.2d 330, 333 (9th Cir.

---

[3]Mr. Egan, the estate's real estate valuation expert, prepared a rebuttal report with respect to the expert report of Mr. Guice, respondent's real estate valuation expert, and Mr. Guice prepared a rebuttal report with respect to the expert report of Mr. Egan.  In addition, each of the estate's stock valuation experts, Mr. Stryker and Mr. Chaffe, prepared a rebuttal report with respect to the expert report of respondent's stock valuation expert Mr. Moore, and Mr. Moore prepared one rebuttal report with respect to the expert reports of Mr. Stryker and Mr. Chaffe.

1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and revg. in part on another ground T.C. Memo. 1986-318. We are not bound by the formulae and opinions proffered by expert witnesses, especially when they are contrary to our judgment. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Davis v. Commissioner, supra. Instead, we may reach a determination of value based on our own examination of the evidence in the record. See Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (citing Silverman v. Commissioner, supra at 933), affg. Ames v. Commissioner, T.C. Memo. 1990-87; Estate of Davis v. Commissioner, supra. The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based. See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Estate of Davis v. Commissioner, supra. Where experts offer divergent estimates of fair market value, we shall decide what weight to give those estimates by examining the factors used by those experts to arrive at their conclusions. See Estate of Davis v. Commissioner, supra; Casey v. Commissioner, 38 T.C. 357, 381 (1962). While we may accept the opinion of an expert in its entirety, see Estate of Davis v. Commissioner, supra; Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use

of any part of such an opinion, see Estate of Davis v. Commissioner, supra; Parker v. Commissioner, 86 T.C. 547, 562 (1986). We also may reject the opinion of an expert witness in its entirety. See Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Estate of Davis v. Commissioner, supra.

The parties and their respective stock valuation experts agree that, in ascertaining the fair market value of decedent's interest in Marrero Land on the valuation date, it is necessary, inter alia, to determine as of that date the aggregate fair market value of Marrero Land's assets and the aggregate amount of its liabilities in order to calculate its net asset value as of that date. Based on the stipulations of the parties, we have found that as of the valuation date the aggregate fair market value of Marrero Land's assets, excluding the remaining unimproved real properties, was $50,643,118, and the parties agree that the aggregate liabilities of the Company as of that date totaled $15,943,694. Although the parties did not stipulate the fair market value on the valuation date of each of the remaining unimproved real properties, they did stipulate that the aggregate value of those properties on that date without regard to an absorption discount is $20,366,470.

According to the estate, in order to arrive at the aggregate fair market value of the remaining unimproved real properties,

and ultimately at the net asset value of Marrero Land as of the valuation date, it is necessary to apply an absorption discount to the stipulated aggregate value of those properties. To support that position, the estate relies on its real estate valuation expert Mr. Egan. According to respondent, no absorption discount is warranted. To support that position, respondent relies on respondent's real estate valuation expert Mr. Guice and a new theory advanced for the first time in respondent's answering brief.

We turn first to respondent's new theory. In respondent's opening brief, respondent relied on Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982), for the following two propositions: "Valuation of stock for tax purposes is a question of fact", and "Where the property to be valued is stock that has never been publicly traded, and there is no evidence of arms-length sales of the stock, the value of the stock must be determined indirectly." For the first time in respondent's answering brief, respondent relies on Estate of Andrews v. Commissioner, supra for the following proposition: "Entity owned real estate is ineligible for a market absorption discount in the estate tax arena."[4] Respondent appears to be arguing that Estate

---

[4]To support respondent's new theory, respondent also cites Estate of Auker v. Commissioner, T.C. Memo. 1998-185, which in turn relies on Estate of Andrews v. Commissioner, 79 T.C. 938
(continued...)

of Andrews holds that, as a matter of law, an absorption discount
may never be allowed in determining the value of real estate
owned by a corporation (or other entity) for estate tax pur-
poses.[5]  We disagree.

In Estate of Andrews v. Commissioner, supra, we were asked
to determine the date-of-death fair market value of certain
shares of stock in four closely held corporations that were held
by the decedent involved in that case.  All four of those cor-
porations were involved in the ownership, operation, and man-
agement of commercial real estate, and they also held some liquid
assets like stocks, bonds, and cash.  See Estate of Andrews v.
Commissioner, supra at 939.  The real estate holdings of the four
corporations in question included warehouses, apartment build-
ings, factories, offices, and retail stores, most of which were
leased to small tenants under leases for periods of less than

---

[4](...continued)
(1982).  We are convinced that respondent is advancing respon-
dent's new theory in the answering brief because Estate of Auker
v. Commissioner, supra, was decided by the Court between the date
on which respondent filed the opening brief in this case and the
date on which it was required to file the answering brief herein.

[5]We find respondent's position that "Entity owned real
estate is ineligible for a market absorption discount in the
estate tax arena" to be inconsistent with the stipulation of
respondent and petitioner in this case that, except for the
remaining unimproved real properties owned by Marrero Land on the
valuation date, the respective values of the unimproved real
properties owned by Marrero Land on that date were determined by
using a discounted cash-flow analysis which included an absorp-
tion discount.

five years. See id. One of respondent's experts in Estate of Andrews performed an appraisal of the assets held by those corporations. See id. at 941. In the case of the real estate assets, that expert used the following three methods of valuation: Comparable sales, replacement costs, and income-producing capacity. After correlating the values found under each of those methods, respondent's expert in Estate of Andrews arrived at values for the respective assets held by the four corporations in which the decedent there involved owned certain shares of stock. See id. at 941-942. Although the estate in Estate of Andrews v. Commissioner, supra, did not attack the valuations by respondent's expert of the underlying assets of the four corporations in question, it

> argued that in arriving at overall net asset value, adjustments should have been made to reflect costs that would have been incurred if the corporations had liquidated all their real estate properties and placed them on the market at one time. The adjustments sought by petitioner are for blockage [i.e., absorption discount], capital gains tax to the seller, real estate commissions, and real estate taxes and special assessments constituting a lien against the real estate. * * *

We rejected the foregoing argument of petitioner in Estate of Andrews v. Commissioner, supra. We held: "When liquidation is only speculative, the valuation of assets should not take these costs into account because it is unlikely they will ever be incurred." Id. In so holding, we relied on the parties' agree-

ment, which was supported by the record in Estate of Andrews, that there was no reasonable prospect of liquidating the real estate properties involved there. See id. We did not hold in Estate of Andrews that, as a matter of law, no adjustment is allowable, inter alia, for blockage (i.e., an absorption discount) with respect to the corporate-owned real properties there involved.[6]

Similarly, our holding in Estate of Auker v. Commissioner, T.C. Memo. 1998-185, that "the entity-owned real estate is ineligible for a market absorption discount" was based on the facts that

> the entities were viable going concerns on the applicable valuation date, and neither a sale nor a liquidation of the entity-owned real estate was contemplated at that time * * *.

We did not hold in Estate of Auker v. Commissioner, supra, that, as a matter of law, no absorption discount may be applied in determining the fair market value of entity-owned real estate.

To the extent that respondent is arguing under respondent's new theory that, as a matter of law, "Entity owned real estate is ineligible for a market absorption discount in the estate tax arena", we reject that argument. In determining the fair market

---

[6]Nor did we hold in Estate of Andrews v. Commissioner, supra, that, as a matter of law, no adjustment is allowable, inter alia, for so-called built-in capital gains tax. See Estate of Davis v. Commissioner, 110 T.C. 530 (1998).

value of property includible in decedent's estate, the appropriate inquiry is a factual one:  What would a hypothetical willing seller and a hypothetical willing buyer take into account in arriving at a price for the remaining unimproved properties? See, e.g., <u>Estate of Davis v. Commissioner</u>, 110 T.C. 530 (1998); see also sec. 20.2031-1(b), Estate Tax Regs.[7]

Respondent contends for the first time in respondent's answering brief that "Marrero Land did not contemplate liquidating its remaining vacant land".[8]  To the extent that respondent is arguing under respondent's new theory that, as a factual matter, no absorption discount is warranted under <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938 (1982), in valuing the

---

[7]Since valuation is a question of fact, and not of law, in at least one case decided after <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938 (1982), we allowed an absorption discount in a situation involving corporate-owned real estate.  See <u>Carr v. Commissioner</u>, T.C. Memo. 1985-19.  In <u>Carr</u>, we were asked to determine the fair market value of certain stock in a corporation which owned real estate and the principal business activity of which was purchasing undeveloped land, subdividing and improving it, and selling the lots either as such or with homes that it built.  We also allowed an absorption discount in a situation involving corporate-owned real estate before <u>Estate of Andrews v. Commissioner</u>, <u>supra</u>, was decided.  See <u>Estate of Folks v. Commissioner</u>, T.C. Memo. 1982-43; <u>Estate of Grootemaat v. Commissioner</u>, T.C. Memo. 1979-49.

[8]Respondent also contends that Marrero Land "had no plans to liquidate".  Although it is true that Marrero Land had no plans to liquidate as of the valuation date, that fact is not determinative of whether an absorption discount may be taken into account in valuing the remaining unimproved real properties that it owned on that date.

remaining unimproved real properties, we shall not consider that argument.[9]  It is well settled that the Court will not consider issues raised for the first time on brief when to do so would prevent the opposing party from presenting evidence that that party might have proffered if the issue had been timely raised.  See <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 891 (1991), affd. 959 F.2d 16 (2d Cir. 1992); <u>Shelby U.S. Distribs., Inc. v. Commissioner</u>, 71 T.C. 874, 885 (1979).  In the present case, the estate had no opportunity to argue, let alone present evidence, relating to respondent's new theory.

We shall now determine whether, based on the record before us, an absorption discount should be applied in determining the aggregate fair market value of the remaining unimproved real properties owned by Marrero Land on the valuation date and, if so, the amount of such a discount.  The concept of an absorption

---

[9]Even if we were to consider such an argument, respondent would have the burden of proof, and the record does not support respondent's contention that "Marrero Land did not contemplate liquidating its remaining vacant land".  To the contrary, we have found that it was anticipated as of the valuation date that the highest and best use of at a minimum approximately 75 percent of the remaining unimproved real properties was to sell them.  Indeed, respondent complains in respondent's answering brief that Marrero Land did not "contemplate selling all the vacant land [remaining unimproved real properties] as a 'portfolio' or unit", thereby conceding that Marrero Land did contemplate selling that land.  On the record before us, we find the instant case to be distinguishable from <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938 (1982), and <u>Estate of Auker v. Commissioner</u>, T.C. Memo. 1998-185, and respondent's reliance on those cases to be misplaced.

discount with respect to real estate derives from the concept of a blockage discount with respect to stock. According to the concept of a blockage discount with respect to stock, a block of stock may be so large in relation to the actual sales on the existing market that it could not be liquidated within a reasonable period of time without depressing the market. See, e.g., Phipps v. Commissioner, 127 F.2d 214, 216-217 (10th Cir. 1942), affg. 43 B.T.A. 1010 (1941); Page v. Howell, 116 F.2d 158 (5th Cir. 1940); Estate of Damon v. Commissioner, 49 T.C. 108, 117 (1967); sec. 20.2031-2(e), Estate Tax Regs. In the case of real estate, the principle of supply and demand may warrant application of an absorption discount. That is because the disposition within a reasonable period of time of similar real properties would result in those properties being in direct competition with each other and other similar real properties in the marketplace. Such an abrupt increase in supply would depress the price for which those properties would sell, assuming that demand were to remain constant. The element of competition, which is a price depressant that is taken into account where similar real properties are valued as a whole, is not taken into account where such properties are valued individually and the different values are totaled.

In deciding whether to apply an absorption discount to the stipulated value (viz., $20,366,470) of the remaining unimproved

real properties and, if so, the amount of such a discount, we shall consider the opinions of the parties' respective real estate valuation experts to see if they are of any assistance to us. Prior to the trial in this case, the parties informed those experts that they had agreed that the aggregate value of the remaining unimproved real properties without taking into account an absorption discount was $20,366,470. The parties instructed those experts to use that stipulated value in determining the aggregate fair market value of those properties.

We note initially that the parties' respective real estate valuation experts agree that the value of the remaining unimproved real properties was negatively affected by the economic conditions prevailing as of the valuation date in the market in New Orleans, Louisiana, in which those properties were located.[10] It is the opinion of Mr. Egan, the estate's real estate valuation expert, that the stipulated value of the remaining unimproved real properties, which was determined pursuant to the comparable sales method under which sales of comparable real properties are used to determine value, is only the first step in the valuation analysis for determining the aggregate fair market value of the properties in question. That is because Mr. Egan believes

---

[10]In fact, Mr. Guice, respondent's real estate valuation expert, stated in his expert report that he expected those adverse economic conditions to continue until the mid-1990's.

(1) that as of the valuation date the supply of unimproved real estate in the market in which the remaining unimproved real properties were located far exceeded the demand for such real estate and (2) that those properties could not have been sold within a reasonable period of time after the valuation date, which, in his opinion, was one year. Consequently, Mr. Egan applied an absorption discount of $12,339,871, which he determined pursuant to a discounted cash-flow analysis, to the stipulated value of the remaining unimproved real properties in order to determine the aggregate fair market value of those properties on the valuation date.

Mr. Guice, respondent's real estate valuation expert, conceded at trial that as of the valuation date the supply of unimproved real estate in the market in which Marrero Land's remaining unimproved real properties were located far exceeded the demand for such real estate. When cross examined at trial about the remaining unimproved real properties that were zoned as commercial, industrial, multifamily residential, and wetlands, which accounted for approximately 94 percent of the stipulated value of the remaining unimproved real properties, Mr. Guice also admitted that those properties could not have been sold within one year after the valuation date. Nonetheless, Mr. Guice refused to apply an absorption discount in determining the aggregate fair market value of those or any other remaining

unimproved real properties. According to Mr. Guice, the comparable sales method is the preferred method of valuing real estate, and that method was used in arriving at the stipulated value as of the valuation date (i.e., $20,366,470) of the remaining unimproved real properties. Consequently, in Mr. Guice's opinion, that stipulated value is the aggregate fair market value on that date of those properties.

Mr. Guice's approach to determining the fair market value of each of the remaining unimproved real properties appears to be inconsistent with his approach to determining the fair market value of each of the other unimproved real properties that Marrero Land owned on the valuation date. With respect to the remaining unimproved real properties, the fair market values of which are in dispute, Mr. Guice did not apply an absorption discount; with respect to the other unimproved real properties, the fair market values of which the parties have stipulated, Mr. Guice used a discounted cash-flow analysis which included an absorption discount. In an attempt to explain the apparent inconsistency in his approaches, Mr. Guice stated in his expert report:

> (1) The properties in question ($20,366,470) consist of varying size lots and parcels of ground (varying from a few thousand square feet up to ± 13 acres) both with and without building improvements.

(2) These various individual sites lie in developed subdivisions having different zoning classifications and different highest and best uses.

(3) Unlike large tracts of raw land, many of these subdivisions were developed more than a decade ago; hence there is <u>no reasonable definitive pattern</u> of recent sales and pricing.

(4) The appraiser can only rely on pertinent market activity, market expectations, and market experience. Market value and the Discounted Cash Flow (DCF) Analysis should be supported by market-derived data, and the assumptions should be both <u>market and property specific</u>.

The appraiser judged that there was not a reasonable pattern of market activity and market expectations for said properties. The appraiser chose to arrive a [sic] the indicated value of these various properties using the Sales Comparison or Market Data Approach of direct comparison using recent sales of similar or like properties.

We do not believe that the foregoing points justify Mr. Guice's view that no absorption discount should be applied in valuing the remaining unimproved real properties. In our opinion, points (1) and (2) above set forth Mr. Guice's concerns about the manner in which Mr. Egan, the estate's real estate valuation expert, calculated the amount of the absorption discount that he applied to the remaining unimproved real properties; they do not support Mr. Guice's opinion that no such discount should be applied. With respect to point (3) above, we agree with Mr. Egan that that point supports Mr. Egan's valuation approach because

> A potential purchaser, cognizant that in a ten year old subdivision where there is "no reasonable definitive pattern of recent sales and pricing," would anticipate that extended marketing periods would be encountered on unsold remaining inventory and that holding costs would be incurred.

With respect to point (4) above, we also agree with Mr. Egan that

> if an absorption analysis that was market and property specific had been performed "pertinent market activity" would have come to light. Such an analysis would have tested the sensitivity of zoning, size and location. By his [Mr. Guice's] own admission, there was "not a reasonable pattern of market activity or market expectations for said properties." This is precisely why a normal marketing period would not have been expected and an orderly sell-off over time needed to be considered.

Mr. Guice also failed to explain satisfactorily, inter alia, why an absorption discount should apply to certain unimproved real properties owned by Marrero Land on the valuation date but not to the remaining unimproved real properties that it owned on that date, which were in the same geographic market and some of which had the same types of zoning and were directly contiguous to the unimproved real properties to which he applied a discounted cash-flow analysis which included an absorption discount. Mr. Guice admitted at trial that the fact that real properties are not contiguous does not determine whether or not to apply a discounted cash-flow analysis which included an absorption discount, and he conceded that he had applied such a discounted cash-flow analysis to certain real properties that were not

contiguous to each other and that therefore did not constitute a subdivision.

Mr. Guice acknowledged in a deposition which was taken by the estate prior to the trial in this case and which was read into the record at that trial that if an attempt were made to sell as one unit certain of the parcels of real estate owned by Marrero on the valuation date, an absorption discount would have to be applied. He also acknowledged at trial that he would have applied an absorption discount if several parcels of land that comprised the remaining unimproved real properties were sold as one unit. In addition, Mr. Guice admitted at trial that there generally is a difference between valuing individual parcels of real estate separately and valuing an entire portfolio of parcels as a whole.

Furthermore, Mr. Guice admitted at trial that an absorption discount analysis involves considering the time that it takes to sell property in relation to the time value of money. That is to say, cash today is worth more than cash in hand in the future. Mr. Guice also acknowledged that, for purposes of valuing multiple parcels of vacant land, it is necessary to discount the cash flow to be derived from the sale of those parcels.

In Mr. Guice's rebuttal report, which contains inappropriate references to and attachments of matters that were the subject of settlement discussions between the parties in this case, Mr.

Guice does not set forth a reasoned analysis in rebuttal to the analysis of Mr. Egan. Instead, in his rebuttal report, Mr. Guice's criticism of the aggregate fair market value of the remaining unimproved real properties that Mr. Egan determined appears to be grounded in Mr. Guice's conclusion that the value arrived at by Mr. Egan simply was too low, especially when considered in relation to the aggregate value of the remaining unimproved real properties that Mr. Egan had determined in his valuation analysis before he applied an absorption discount and before the parties agreed to stipulate to the aggregate value of those properties without applying such a discount.[11]

On the instant record, Mr. Guice has failed to persuade us that no absorption discount should be applied to any of the remaining unimproved real properties. We did not find Mr. Guice's opinion as to the aggregate fair market value of those properties to be reliable, and we shall not rely on it in making that determination.

According to Mr. Egan, in attempting to value multiple real properties, it is necessary to determine the length of time that it would take to sell such properties and, depending on market

---

[11]Upon questioning by the Court, Mr. Egan indicated that he would use the methodology described in his expert report regardless whether or not the parties had agreed to an aggregate value of the remaining unimproved real properties that was higher or lower than the value to which they ultimately stipulated.

conditions, to apply a discounted cash-flow analysis which included an absorption discount, which he also referred to as a subdivision analysis, to arrive at the values of such properties. Mr. Egan acknowledged that if all the remaining unimproved real properties could have been sold within a reasonable period of time after the valuation date, which he assumed to be one year, the prices established under the comparable sales method would have been the equivalent of the fair market value of each of those properties. However, Mr. Egan opined, and Mr. Guice conceded, that, because of market conditions, the remaining unimproved real properties could not have been sold within a one-year period of time. Consequently, as a result of the prevailing market conditions on the valuation date, Mr. Egan concluded that it was necessary to use a discounted cash-flow analysis, which he considers to be the same as a subdivision analysis. According to Mr. Egan, such an analysis considers a regular stream of income over a period of time from the sale of multiple properties, such as the remaining unimproved properties that Marrero Land owned on the valuation date, and discounts the net periodic cash flow projected for such properties to a present value with an appropriate discount rate that reflects market conditions. Mr. Egan indicated that a discounted cash-flow analysis or subdivision analysis, which includes an absorption discount, is not limited to multiple parcels of real property that are in a single

subdivision or tract of land, but is used in any valuation of multiple real properties if they cannot be sold within a reasonable period of time.

In applying a discounted cash-flow analysis to the remaining unimproved real properties, Mr. Egan separated those properties into the following categories or types, based on the zoning applicable to those properties: Commercial, industrial, multi-family residential, single-family residential, wetlands, unrestricted, and miscellaneous. Except for the wetlands and unrestricted categories for which no empirical data were available, Mr. Egan estimated based on available data how long it would take for the market to absorb each category or type of property by comparing (1) the volume of unimproved real estate located on the west bank of the Mississippi River in the New Orleans metropolitan area that fit within each such category and that was sold over certain time periods to (2) the value of the remaining unimproved real properties of each such category that Marrero Land owned on the valuation date and that also was located on the west bank of the Mississippi River in that area. Mr. Egan assumed that as of the valuation date Marrero Land could have captured 50 percent of the demand for real estate in the prevailing market. He estimated that, except for the wetlands and the unrestricted categories of real property, it would have taken the market from two years to 13 years, depending on the

type of property, to absorb the remaining unimproved real properties. As for the wetlands and unrestricted categories of real property, Mr. Egan estimated that it would have taken five years for the market to absorb those types of property because of the large amount of land within those categories that Marrero Land owned on the valuation date. Mr. Egan allocated the stipulated value of the remaining unimproved real properties (viz., $20,366,470) to the different types of such properties and to the years over which each of those types of properties would be absorbed by the market (projected absorption period) in order to determine the projected gross receipts therefrom. Mr. Egan projected the costs, such as marketing costs, sales commissions, overhead and administration, and property taxes, that would be incurred as a result of sales efforts during the projected absorption period for each category of the remaining unimproved real properties. With respect to each year of the applicable projected absorption period for each such category, Mr. Egan reduced the projected gross receipts by those projected costs and projected developer's profit for that year to arrive at Marrero Land's prospective cash flow before debt service. Mr. Egan then determined a discount rate of 23 percent for the applicable projected absorption period for each category of property, which was supposed to reflect investor risk and market conditions with respect to each such category. In determining that discount

rate, Mr. Egan relied on the rate of return on the sale by a partnership between 1990 and 1995 of industrial real estate situated in an industrial park in the metropolitan New Orleans area, which he adjusted to take account of the respective pro-jected absorption periods and risks that he determined for the various categories of the remaining unimproved real properties. Finally, Mr. Egan discounted the prospective cash flow for each year of each projected absorption period back to the valuation date in order to arrive at the fair market value of the prop-erties within each of the categories of remaining unimproved real properties on that date and totaled each such value to arrive at the aggregate fair market value on that date of those properties, which he determined to be $8,026,599.

Respondent points to certain alleged deficiencies in Mr. Egan's analysis. Respondent contends that Mr. Egan's application of an absorption discount as part of his discounted cash-flow analysis is not warranted when real estate is already developed and awaiting sale to the ultimate consumer. We disagree. We have applied an absorption discount in valuing developed lots of real estate. See, e.g., Carr v. Commissioner, T.C. Memo. 1985-19. On the instant record, we find that a willing hypothetical buyer and a willing hypothetical seller would consider the rate of absorption of similar real properties, whether developed or

undeveloped, in the prevailing market in deciding the price for such properties.

Respondent also contends that Mr. Egan improperly assumed that all of the properties within each of the different categories of the remaining unimproved real properties would have competed in the marketplace. We agree with respondent. We believe that only those real properties in each category (1) that are similar in size and (2) that are valued before application of an absorption discount at approximately the same price per square foot would have competed with one another.

We are also concerned with certain other aspects of Mr. Egan's valuation analysis. Mr. Egan included all of the remaining unimproved real properties in his discounted cash-flow analysis, even though, in his view, the highest and best use of certain of those properties was not "for retail sale". We believe that Mr. Egan should have included in his discounted cash-flow analysis only those remaining unimproved real properties whose highest and best use was to sell them. See Estate of Andrews v. Commissioner, 79 T.C. at 942.

Mr. Egan does not explain how he arrived at an absorption period of five years for the unrestricted and wetlands categories of those properties. In addition, Mr. Egan states that "research was conducted for comparable sales transactions by property type for the period 1979 through 1988" with respect to the industrial

category of the properties in question, and that "case research was limited to the 1985-88 time frame" for the commercial, multifamily residential, and single-family residential categories of those properties. However, he does not adequately explain why different time frames were used for the industrial and for the commercial, multifamily residential, and single-family residential categories of the remaining unimproved real properties. Furthermore, while Mr. Egan claims to have considered the time period consisting of 1985 through 1988 with respect to the two residential categories of properties in question, in fact he used, with no explanation, comparable sales transactions from 1984 through 1987 for the multifamily residential category and from 1984 through 1986 for the single-family residential category.

We also found the basis on which Mr. Egan calculated the discount rate that he applied to be unacceptable. Mr. Egan calculated that rate based on the rate of return on the sale by a partnership between 1990 and 1995 of industrial real estate situated in an industrial park in the metropolitan New Orleans area, which he adjusted to take account of the respective projected absorption periods and risks that he determined for the various categories of the remaining unimproved real properties. That sale took place well after the valuation date of February 7, 1988, was not reasonably foreseeable on that date, and should not

have been taken into account in valuing the remaining unimproved real properties as of that date. See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1228 (1987). Moreover, even assuming arguendo that it had been appropriate to use the postvaluation date sale on which Mr. Egan relied in valuing the remaining unimproved real properties, we are not persuaded that the rate of return by one partnership on one sale of an industrial park is necessarily the rate of return that could be expected with respect to the different categories of the remaining unimproved real estate properties.

Taking into account the foregoing problems that we have with Mr. Egan's valuation analysis, and bearing in mind that valuation is necessarily an approximation and a matter of judgment, rather than of mathematics, see Estate of Davis v. Commissioner, 110 T.C. at 554, on which the estate has the burden of proof, see Rule 142(a), we find that an absorption discount of $1.7 million should be applied to the stipulated value (viz., $20,366,470) of the remaining unimproved real properties in arriving at the aggregate fair market value of those properties on the valuation date. Consequently, we further find that as of that date the aggregate fair market value of those properties was $18,666,470

and that the aggregate fair market value of Marrero Land's assets was $69,309,588.[12]

We shall now consider the views of the parties' respective stock valuation experts, each of whom determined the fair market value of decedent's interest in Marrero Land on the valuation date. We turn first to respondent's stock valuation expert, Mr. Moore. Mr. Moore applied the following three approaches in valuing decedent's interest in Marrero Land: Discounted net asset value approach, public market multiples approach, and liquidation value approach. In arriving at a value under the discounted net asset value approach, Mr. Moore applied a real estate company discount of 30 percent to the net asset value of Marrero Land as of the valuation date. Mr. Moore determined that net asset value by relying on, inter alia, Mr. Guice's determination of the aggregate fair market value of the remaining unimproved real properties on that date. He then applied a 35-percent lack-of-marketability discount and arrived at a value for decedent's interest in Marrero Land as of the valuation date of $8,364,731. Mr. Moore considered the discounted net asset value approach to be "quite realistic".

---

[12]We have considered all of the contentions of respondent regarding Mr. Egan's valuation of the remaining unimproved real properties that are not discussed herein, and we find them to be without merit.

Under the public market multiples approach, Mr. Moore applied a 30-percent real estate company discount to the aggregate value of the unimproved real properties owned by Marrero Land on the valuation date. He determined that value by using, inter alia, Mr. Guice's determination of the aggregate fair market value of the remaining unimproved real properties as of that date. Application by Mr. Moore of a 30-percent real estate company discount to the value of unimproved real properties owned by Marrero Land on the valuation date resulted in what Mr. Moore described as the implied public market capitalization of the Company's unimproved real properties. Mr. Moore then capitalized the earnings, book value, and dividends, respectively, of Marrero Land to arrive at what he referred to as the implied public market capitalization of the Company's income-producing properties using each of those factors. He then added the implied public market capitalization of the unimproved real properties owned by Marrero Land as of the valuation date to the implied public market capitalizations of its income-producing properties determined by using earnings, book value, and dividends, respectively, which resulted in what he characterized as the implied market capitalization of Marrero Land using each of those factors. He determined what he described as the respective implied public market values of decedent's interest in Marrero Land as of the valuation date using earnings, book value, and

dividends, respectively, by multiplying the respective implied

market capitalizations of Marrero Land using those factors by the

percentage interest of decedent in the Company as of that date.

Finally, Mr. Moore applied a 35-percent lack-of-marketability

discount to each of those implied public market values to arrive

at the following values of decedent's interest in Marrero Land on

the valuation date using earnings, book value, and dividends,

respectively: $7,255,468, $6,812,280, and $7,266,956.  According

to Mr. Moore, the public market multiples "approach is essen-

tially a different way of valuing the improved real estate.  To

our view, it is a less exact approach than the discounted net

asset value approach which utilizes the appraised value of the

improved real estate investments."

Under the liquidation value approach, Mr. Moore applied a

10-percent bulk sales discount to the aggregate value of the real

properties owned by Marrero Land on the valuation date, which he

determined by relying on, inter alia, Mr. Guice's value of the

remaining unimproved real properties.  The resulting product was

what Mr. Moore characterized as the liquidation value of Marrero

Land's real properties as of the valuation date.  He reduced that

liquidation value by the book value of those real properties to

determine what he described as "Capital gain in liquidation".

Mr. Moore applied a 34-percent capital gains tax rate to that

capital gain, resulting in a capital gains tax of $12,293,109.

He reduced the aggregate value of the real properties of Marrero Land on the valuation date by the amount of that capital gains tax in order to arrive at the net proceeds from real properties "in liquidation". Mr. Moore added the value of the other assets owned by the Company on the valuation date to those net proceeds to arrive at what he characterized as total assets of the Company. He reduced those total assets by the aggregate liabilities that the Company had as of the valuation date to arrive at what he termed the liquidation value of the Company, viz., $36,799,147. Mr. Moore applied a minority discount of 23 percent to that liquidation value, which resulted in what he characterized as an implied market capitalization of $28,335,343. He determined what he described as the implied public market value of decedent's interest in Marrero Land on the valuation date by multiplying the implied market capitalization by the percentage interest in Marrero Land that decedent owned on that date. Mr. Moore then applied a 35-percent lack-of-marketability discount to the implied public market value of decedent's interest in Marrero Land on the valuation date to arrive at a value of that interest under the liquidation value approach of $6,146,153. Mr. Moore considered the liquidation value approach to be "significant".

Mr. Moore indicated in his expert report that he was instructed by respondent to ignore the effect of amended article VI and the voting trust in determining the fair market value of

decedent's interest in Marrero Land on the valuation date.  Mr. Moore admitted at trial that if he had not been instructed to ignore amended article VI and the voting trust, he would have applied an additional 15-percent discount in determining the fair market value of decedent's interest in Marrero Land, approximately four percent to six percent of which was attributable to the voting trust.

Mr. Moore acknowledged at trial that, in valuing decedent's interest in Marrero Land, he placed the greatest weight on its net asset value as of the valuation date, determined by using, inter alia, Mr. Guice's value for the remaining unimproved real properties.  That was the case not only under Mr. Moore's discounted net asset value approach, but also under his public market multiples approach and his liquidation value approach.[13]  In this connection, Mr. Moore had only one material criticism of the respective valuation analyses by Mr. Chaffe and Mr. Stryker that were within the realm of his expertise as a stock valuation expert.[14]  According to Mr. Moore, in their respective expert

_____

[13]To the extent Mr. Moore relied on his liquidation value approach, which does not appear to be the case despite his having indicated that such an approach is "significant", we find such reliance to be unwarranted.  That is because decedent's interest in Marrero Land as of the valuation date was a minority interest that could not force the liquidation of the Company.

[14]Most of Mr. Moore's rebuttal report attempted to rebut Mr. Egan's valuation analysis of the remaining unimproved real

(continued...)

reports, the estate's stock valuation experts "seemed to turn their backs on standard methodology of valuing a real estate holding company (which calls for important weight to be given to net asset value)".

Contrary to Mr. Moore's assertion, Marrero Land is not merely a real estate holding company. It is an operating company that acquires, develops, manages, improves, maintains, leases, and sells real estate. We have examined the respective reports and the testimony of the estate's stock valuation experts and find that they properly took all those facts into account in their respective valuation analyses of decedent's interest in Marrero Land on the valuation date. We have examined Mr. Moore's reports and his testimony at trial. Based on that examination, we believe that Mr. Moore improperly accorded disproportionate weight to the Company's net asset value (determined by relying on, inter alia, Mr. Guice's opinion as to the value of the remaining unimproved real properties) in determining the fair market value of decedent's interest in Marrero Land on the valuation date. On the record before us, we are not persuaded

---

[14](...continued)
properties. Respondent offered Mr. Moore, and we found him to be qualified, as a stock valuation expert, not a real estate valuation expert. At trial, respondent stipulated that the portions of Mr. Moore's rebuttal report addressing real estate valuation matters should be deemed stricken from the record in this case, and the Court so ordered.

that Mr. Moore's opinion as to the fair market value of decedent's interest in Marrero Land is reliable, and we shall not rely on it.

In determining the value of decedent's interest in Marrero Land on the valuation date, the estate's stock valuation expert Mr. Stryker examined, inter alia, the history, ownership, management, employees, and financial condition of Marrero Land, as well as the outlook for the Company, as of that date. Mr. Stryker considered each of the following three principal approaches to value prescribed by the Uniform Standards of Professional Appraisal Practice: The cost approach, the market approach, and the income approach. Mr. Stryker used the cost approach and the market approach. He considered but did not use the income approach because the management of Marrero Land had not prepared long-term income projections for the Company.

Under the cost approach, Mr. Stryker used the net asset value method to determine the fair market value of decedent's interest in Marrero Land. He determined the net asset value of Marrero Land on the valuation date by using, inter alia, the value of the remaining unimproved properties determined by Mr. Egan. Mr. Stryker discounted that net asset value by 40 percent based on his analysis of the Company and of data relating to the discount from net asset value at which certain publicly traded real estate operating entities were being freely traded on the

public market.  He then applied a 35-percent discount for lack-of-marketability.  After applying those discounts, Mr. Stryker determined under the cost approach that the fair market value on the valuation date of the common stock of Marrero Land on a minority, noncontrolling basis was $33,406 per share.

Under the market approach, Mr. Stryker first determined the value of the stock of Marrero Land as if it were freely traded. He computed that value by analyzing and comparing the operating performances and financial conditions of selected comparable publicly traded real estate companies and of Marrero Land.  In comparing Marrero Land and the comparable companies, Mr. Stryker examined size, profit margins, earning power (i.e., turnover ratios and rates of return), long-term return (i.e., annual growth rates), and financial risk (i.e., capital structure and fixed-charges coverage).  Mr. Stryker indicated that investors in freely traded common stocks of public companies generally evaluate those stocks with investor appraisal ratios, such as price-to-earnings ratios, price-to-cash flow ratios, and price-to-tangible book value ratios, and dividend yields.  Because Marrero Land was an S corporation as of the valuation date and its 1987 and expected future distributions were not comparable to dividends paid by public companies, Mr. Stryker did not consider dividend yields in his market approach to value.

Mr. Stryker's expert report set forth the price-to-earnings ratios and the price-to-cash flow ratios of the comparable public companies that he selected based on average five-year, average three-year, latest year, and latest 12-months earnings and cash flow,[15] respectively. Mr. Stryker's expert report set forth the price-to-tangible book value ratios of the comparable public companies that he selected by comparing each such company's public price during the valuation period to its latest year-end tangible book value and its return on equity for the latest year and median for the latest five years. In determining the price-to-earnings ratios, price-to-cash flow ratios, and price-to-tangible book value ratios for Marrero Land based on an examination of those respective ratios for the comparable public companies that Mr. Stryker selected, Mr. Stryker made adjustments that he considered to be appropriate for differences between Marrero Land and those companies. Mr. Stryker calculated the respective price-to-earnings ratios and the price-to-cash flow ratios for Marrero Land based on average three-year and latest year earnings and cash flow (determined both as net income plus depreciation

---

[15]The price-to-cash flow ratios of the comparable companies that Mr. Stryker selected contained price-to-cash flow ratios of those companies based on (1) average five-year, average three-year, latest-year, and latest 12-months cash flow defined as net income plus depreciation and amortization and (2) total capitalization to average five-year, average three-year, latest-year, and latest 12-months pretax, pre-interest cash flow (EBITDA).

and amortization and EBITDA). In determining the respective price-to-earnings ratios and price-to-cash flow ratios of Marrero Land, Mr. Stryker gave the greatest weight to the respective indicated values based on its latest year earnings and cash flow (determined both as net income plus depreciation and amortization and EBITDA). With respect to the price-to-tangible book value ratios, Mr. Stryker concluded that the comparable public companies that he selected sold at between 74.2 percent and 666.3 percent of tangible book value. According to Mr. Stryker, Marrero Land's rates of returns on equity of 8.7 percent for the latest year and median of 12.8 percent for the latest five years did not compare favorably with the rates of those public companies. As a result, Mr. Stryker determined that a ratio of price-to-tangible book value of 100 percent was applicable to Marrero Land's common stock as of the valuation date.

The indicated values that Mr. Stryker determined on the basis of an examination of price-to-earning ratios, price-to-cash flow ratios, and price-to-tangible book value ratios resulted in the following indicated values per share of stock of Marrero Land as of the valuation date:

|                              Indicated        |
| Appraisal Ratios             | Value Per Share |
|------------------------------|-----------------|
| Price-to-earnings            | $19,200         |
| Price-to-cash flow (net income plus depreciation and amortization) | 22,200 |
| Price-to-cash flow (EBITDA)  | 22,000          |
| Price-to-tangible book value | 25,900          |

In reconciling the foregoing indicated values, Mr. Stryker gave the greatest weight to the indicated value based on price-to-earnings ratios and the least weight to the respective indicated values based on price-to-cash flow ratios (EBITDA) and price-to-tangible book value ratios.

Mr. Stryker concluded under the market approach that the freely traded value of the common stock of Marrero Land as of the valuation date was $21,200 (rounded) per share. Mr. Stryker then applied a discount of 35 percent because "the holder of a minority and noncontrolling interest in the common stock of Marrero, unlike the holders of common stock in the selected public companies, had no market for his or her shares other than by a private sale, and could not compel registration".[16] After applying that discount, Mr. Stryker determined under the market approach that the fair market value on the valuation date of the common stock of Marrero Land on a minority, noncontrolling basis was $13,800 per share.

---

[16]In determining that discount, Mr. Stryker did not consider amended article VI, but he did give consideration to the voting trust.

Mr. Stryker gave equal weight to the respective values that he determined under the cost approach and the market approach and determined that the fair market value of decedent's interest in Marrero Land on the valuation date was $23,600 (rounded) per share, or $3,933,412.[17]

In determining the fair market value of decedent's interest in Marrero Land on the valuation date, Mr. Chaffe, who also was the estate's stock valuation expert, took into account factors unique to Marrero Land that were similar to the factors considered by Mr. Stryker.  Mr. Chaffe determined that fair market value by using the following approaches:  (1) A market approach using comparative analyses to publicly traded (a) guideline companies and (b) real estate investment trusts (REIT's) and real estate operating companies (REOC's); (2) an income approach utilizing a discounted cash flow model; and (3) an asset approach utilizing a liquidation model (asset approach/liquidation model).

---

[17]Although Mr. Stryker considered in his valuation process the book value price set forth in amended article VI, he did not use that price in determining the fair market value of decedent's interest in Marrero Land on the valuation date because his determination of that fair market value was less than that price. He concluded that no person would decide to buy decedent's interest in Marrero Land at book value pursuant to amended article VI, since that value would have been higher on the valuation date than the fair market value of that interest that he determined.

We turn first to the asset approach/liquidation model used by Mr. Chaffe. Under that approach, Mr. Chaffe considered a liquidation model of Marrero Land on the valuation date under which he assumed that its assets were sold on that date at their respective fair market values. The aggregate fair market value on the valuation date of the remaining unimproved real properties that Mr. Chaffe used was that value determined by Mr. Egan. Although Mr. Chaffe considered the asset approach/liquidation model, he concluded that it was not an appropriate approach to use in determining the value of decedent's interest in Marrero Land, which was a minority interest that had no ability to force the Company's liquidation or the disposition of its assets. The results that Mr. Chaffe obtained under the asset approach/liquidation model were used by him only as an indication of an outside limit or range of value.

Under the market approach, Mr. Chaffe analyzed and compared certain financial data of five publicly traded guideline companies and Marrero Land. Mr. Chaffe made adjustments for differences between those companies and Marrero Land and, by implicit weighting, concluded under the market approach that the marketable, minority value of the common stock of Marrero Land using publicly traded guideline companies was $17,100,000.

Because Marrero Land's primary asset on the valuation date was real estate, Mr. Chaffe also did a comparison under the

market approach of Marrero Land to a group of publicly traded REIT's and REOC's that he selected from the Realty Stock Review, which publishes a market analysis of REIT's and REOC's, their net asset values, and dividend yields. Mr. Chaffe indicated in his expert report that the selection of REIT's and REOC's as a guide-line for comparison was intended to give actual free market pricing comparisons for the common stock of Marrero Land which did not trade freely in an open marketplace. The following is a summary of the various pricing calculations and tests that Mr. Chaffe performed:

| REIT's | Value Indication |
|---|---|
| Net asset value[18] | $26,200,588 |
| Pretax earnings | 14,712,697 |
| Actual distribution | 8,156,459 |
| Assuming Marrero Land pays out 95% of earnings | 14,673,153 |
| Finding of value by implicit weighting | $18,000,000 |

| REOC's | Value Indication |
|---|---|
| Net asset value[19] | $24,969,430 |
| After-tax earnings | 13,267,949 |
| Dividends | 14,435,484 |
| Finding of value by implicit weighting | $17,000,000 |

---

[18]In determining the net asset value of Marrero Land, Mr. Chaffe relied on, inter alia, Mr. Egan's valuation of the re-maining unimproved real properties.

[19]See supra note 18.

Mr. Chaffe concluded under the market approach that the marketable, minority value as of the valuation date of the common stock of Marrero Land as voting stock was $18 million using the REIT models and $17 million using the REOC models.

Under the income approach, Mr. Chaffe essentially used a discounted cash flow model under which current expected cash flow was used as a basis for determining the fair market value of the common stock of Marrero Land on the valuation date. The discounted cash flow model that Mr. Chaffe used was based on cash flow available to a minority shareholder. According to Mr. Chaffe,

> A discounted cash flow ("DCF") model is a method used to determine the minority equity price of a Company by a discount or present value method applied to the future cash flow of the Company available to the minority shareholder through dividends or growth from retained earnings. In such a DCF model, the investor receives the free cash flow, which is the cash generated by the Company that is available to pay dividends or be reinvested to produce future profits. The future stream of annual cash flow and the terminal or residual value must be discounted to arrive at the present value.

In applying the discounted cash flow model, Mr. Chaffe assumed that cash flow is the amount of money available to benefit minority shareholders. Based on historical cash flows of Marrero Land, the outlook for the Company and for the industry, and discussions with the Company's management, Mr. Chaffe determined that $1,409,676 was the appropriate level of free cash

flow in the base year (to December 31, 1987) of the discounted cash flow model. The model that Mr. Chaffe used considered a seven-year period of cash flow of the Company, which Mr. Chaffe assumed would remain level throughout the discounting period. Mr. Chaffe adjusted the discount rate because he assumed that there would be no growth in the cash flow of Marrero Land over that seven-year period. Mr. Chaffe's discounted cash flow model further assumed a terminal value equal to the liquidation value of Marrero Land, which, according to Mr. Chaffe, assured sale of the real estate held by the Company at its appraised value. The discount rate that Mr. Chaffe used was the rate of return that an investor would require to assume the risk of owning stock of the Company. In determining that discount rate, Mr. Chaffe considered returns available on other investments as well as an evaluation of the risk level of Marrero Land and a comparison of that risk level with market-based returns on equity securities with similar risks. Mr. Chaffe used a discount rate of 20.2 percent based on the yield on Treasury bonds as of the valuation date and historical equity premiums.[20]

---

[20]The yield on a seven-year Treasury bond in February 1988 was 8.2 percent (risk free rate). As reported in Ibbotson Associates 1988 Yearbook (Ibbotson Yearbook), the equity risk premium based on a broad list of traded equities (S&P 500 Index) was 8.3 percent. Mr. Chaffe added the small-company stock risk premium of 3.7 percent, which he also took from the Ibbotson Yearbook, to the historical risk premium of the Standard & Poor

(continued...)

Mr. Chaffe determined under the income approach utilizing a discounted cash flow model that the marketable, minority value of the Company's stock as of the valuation date was $12,549,597.

The value indications that Mr. Chaffe arrived at for the marketable, minority value of the common stock of Marrero Land on the valuation date under the different valuation approaches that he used were:

| Valuation Approach | Value Indication |
|---|---|
| Market approach | |
| Publicly traded | |
|   guideline companies | $17,100,000 |
| REIT's | 18,000,000 |
| REOC's | 17,000,000 |
| Income approach using | |
|   discounted cash flow model | 12,549,597 |

Based on a review of the various tests of value that he used and using implicit weighting, Mr. Chaffe determined that the aggregate "as if traded" value of the common stock in minority blocks of shares of Marrero Land as of the valuation date was $18,000,000.  That value resulted from a weighting upward from the respective values that he determined under the market approach using publicly traded guideline companies and the income approach utilizing a discounted cash flow model to the market

---

[20](...continued)
500 Index.  Adding those three rates indicated an expected return rate for the smaller-company traded stocks of 20.2 percent (8.2 percent risk free rate plus 8.3 percent S&P 500 Index plus 3.7 percent small-company stock premium).  Mr. Chaffe did not add a specific company risk premium because he used a no-growth model of future cash flow.

approach using REIT models, which emphasized asset values and pretax levels of earnings and cash flow.

Mr. Chaffe applied a discount of approximately five percent in order to reflect the fact that decedent's interest in Marrero Land was governed by the voting trust and therefore was a non-voting interest and a discount for lack of marketability of 40 percent. Mr. Chaffe determined that the fair market value of decedent's interest in Marrero Land on the valuation date was $20,917 per share, or $3,486,167.[21]

Respondent asserts that we should not rely on the respective opinions of Mr. Stryker and Mr. Chaffe. Respondent contends that, in considering the price-to-earnings ratios of publicly traded companies under Mr. Stryker's market approach, he used the latest-year earnings rather than the higher average three-year earnings or the even higher average five-year earnings. Mr. Stryker did not use the average five-year earnings because that earnings level "was much higher than Marrero's expected future recurring earnings level." We agree with Mr. Stryker's judgment not to use the average five-year earnings. Mr. Stryker used the average three-year earnings for 1985-1987 and the latest year

---

[21]Mr. Chaffe considered in his valuation analysis amended article VI. However, because he determined that the fair market value of decedent's interest in Marrero Land on the valuation date was less than that book value and that, consequently, "the book value purchase options would not be exercised", Mr. Chaffe did not use that book value price in his valuation analysis.

(1987) earnings. However, he gave the greatest weight to the indicated value based on the latest year (1987) earnings. Given the economic conditions extant in 1987 relative to 1985 and 1986, we agree with Mr. Stryker's judgment to give the greatest weight to 1987 earnings in determining indicated value using the price-to-earnings ratios method.

Respondent claims that Mr. Chaffe did not use, but should have used, the net asset value approach in valuing decedent's interest in Marrero Land. While respondent is correct that Mr. Chaffe did not use the net asset value approach, Mr. Chaffe did place very substantial weight on Marrero Land's net asset value in his market approach using REIT's. Mr. Chaffe placed the greatest weight on that approach in determining the aggregate "as if traded" value of the common stock in minority blocks of Marrero Land as of the valuation date, to which he applied discounts for nonvoting stock and lack of marketability in order to arrive at the fair market value of decedent's interest in Marrero Land on that date.

On the record before us, we are satisfied with the respective valuation analyses of Mr. Stryker and Mr. Chaffe in determining the fair market value of decedent's interest in Marrero Land on the valuation date.[22] However, each of those respective

_____

[22]We have considered all of the arguments of respondent

(continued...)

analyses must incorporate our finding as to the aggregate fair market value on that date of the remaining unimproved real properties of Marrero Land.  We have incorporated that finding into the respective valuation analyses of Mr. Chaffe and Mr. Stryker, which results in a fair market value on the valuation date of decedent's interest in Marrero Land of $4,611,417 under Mr. Stryker's analysis and $4,000,328 under Mr. Chaffe's analysis.  On the instant record, we find that those values set the appropriate range from which we may determine the fair market value of that interest on that date.

Based on our examination of the entire record in this case, and bearing in mind that valuation is necessarily an approximation and a matter of judgment, rather than of mathematics, see Estate of Davis v. Commissioner, 110 T.C. at 560, on which the estate has the burden of proof, see Rule 142(a), we find that on the valuation date the fair market value of decedent's interest in Marrero Land is its book value, i.e., $4,316,920.[23]

_____

[22](...continued)
relating to the estate's stock valuation experts that are not addressed herein, and we find them to be without merit.

[23]Because the fair market value of decedent's interest in Marrero Land on the valuation date that we have found does not exceed the book value of that interest (i.e., $4,316,920) determined under amended article VI, we shall not address the estate's alternative position that, because amended article VI controls the fair market value for estate tax purposes, the
(continued...)

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[23](...continued)
maximum fair market value of that interest on that date is its
book value.